19 F.3d 719
 UNITED STATES of America, Appellee,
v.
Efrain NUNEZ, Defendant, Appellant.
 No. 92-2356.
 United States Court of Appeals,
First Circuit.
 Heard Aug. 3, 1993.
Decided March 24, 1994.
 
 Thomas R. Lincoln, with whom Law Offices of Thomas R. Lincoln, San Juan, PR, was on brief, for appellant.
 Esther Castro-Schmidt, Asst. U.S. Atty., with whom Charles E. Fitzwilliam, U.S. Atty., and Jose A. Quiles Espinosa, Sr. Litigation Counsel, Hato Rey, PR, were on brief, for appellee.
 Before SELYA, CYR and BOUDIN, Circuit Judges.
 CYR, Circuit Judge.
 
 
 1
 After a two-day jury trial, Efrain Nunez, a Dominican national, was convicted of possessing approximately two kilograms of cocaine, with intent to distribute, in violation of 21 U.S.C. Sec. 841(a)(1). On appeal, Nunez challenges the district court's refusal to suppress the contraband obtained during his detention by the United States Customs Service (Customs) at Luis Marin International Airport in Carolina, Puerto Rico, on Sunday, May 24, 1992.
 
 
 2
 * BACKGROUND
 
 A. Airport Detention
 
 3
 The facts are unremarkable up until the point in time--approximately 3:55 p.m.--when Nunez was first observed by two Customs agents, Olga Silva and Victor Ramos, who were "profiling passengers" near the American Airlines ticket counter. After Nunez attracted their attention because he appeared to be walking stiffly, the agents followed him toward the American Airlines concourse, and observed as he cleared the security checkpoint without incident.[1] As Nunez placed his carry-on bag on the floor before presenting his passport at the Immigration and Naturalization Service (INS) checkpoint, Customs Agents Ramos and Silva noticed several bulges around his midsection and observed that he had difficulty bending. At this point, Silva left to summon Senior Customs Investigator Isidro Rivera Sanchez (Rivera).
 
 
 4
 At approximately 4:10 p.m., Rivera approached Nunez at the INS checkpoint, identified himself as a Customs agent, and posed a series of perfunctory questions. At one point, when Nunez bent down to show Rivera his carry-on bag, Rivera observed the "bulges" seen by Silva and Ramos minutes before, and decided to question him further. Rivera escorted Nunez to a room off the main concourse. Seeking to ensure that the "bulges" were not explosives that might have gone undetected at the security checkpoint, Rivera conducted a "pat-down frisk" which revealed that four packages had been "adapted" to fit around Nunez's midsection. Finding no wires, Rivera informed Nunez that he would be detained by Customs, then conducted him to a secure 8' X 8' holding room in the customs enclosure.
 
 
 5
 As the case wended its way through the Customs chain of command, two more Customs agents became involved: Senior Supervisory Agent Carlos Ruiz Hernandez (Ruiz) and his supervisor, Senior Agent Ben Garcia (Garcia). When Garcia arrived on the scene, he directed Ruiz to arrange for a drug-detection dog to be brought to the customs enclosure. Later, Garcia and Ruiz went to the holding room, where Garcia informed Nunez that he was suspected of smuggling contraband and that the Drug Enforcement Administration (DEA) was being requested to secure a warrant to search his person. At approximately 5:30 to 5:45 p.m., Garcia administered Miranda warnings to Nunez. At approximately 5:45 to 6:00 p.m., Ruiz attempted to arrange for a drug-detection dog.[2]
 
 
 6
 The situation inside the holding room changed dramatically as Ruiz was attending Nunez while awaiting the arrival of the drug-detection dog. Suddenly, Nunez spontaneously informed Ruiz that he had worked as an auto mechanic in New York but that work was scarce and "times are tough--you have to make a buck any way you can." As Nunez spoke, he slowly began unbuttoning his shirt. Sensing that Nunez was preparing to shed the "bulges," Ruiz decided to "give him the opportunity," and turned away while continuing to observe surreptitiously. Shortly thereafter, Ruiz heard a rustling sound and glimpsed a series of movements. When Ruiz turned toward Nunez, four packages lay near him on the floor; it was approximately 6:30 p.m.
 
 
 7
 Ruiz immediately performed a field test, which indicated that the packages contained cocaine. Nunez was arrested. At Ruiz's instruction, Nunez removed his unbuttoned shirt, revealing two girdles and the body imprints left by the packages he had been carrying around his midsection. When the passive drug-detection dog finally arrived at approximately 7:00 p.m., it "alerted" in the area of Nunez's midsection where the bulges had been concealed.
 
 B. District Court Proceedings
 
 8
 At a pretrial conference on June 15, 1992, defense counsel represented that he would move to suppress the contraband recovered from the floor of the detention room. The district court accordingly entered a pretrial order pursuant to Fed.R.Crim.P. 12(c), setting June 22 as the deadline for pretrial motions and July 29 as the trial date. No motion to suppress was filed within the prescribed period. On July 23, however, six days before trial, the government informed defense counsel that it would introduce newly discovered evidence relating to the pre-arrest admission by Nunez, which Customs Agent Ruiz only recently had brought to the prosecutor's attention. See supra at p. 720. The next day, five days before trial, defense counsel moved to suppress both the Nunez admission and the contraband. The motion simply contended that the contraband was the inadmissible product of a pretextual investigatory stop, but asserted no challenge based on the duration of the detention.
 
 
 9
 On the morning of July 29, 1992, after jury empanelment, the district court heard argument on the government's objection based on the untimeliness of the motion to suppress the contraband. The government argued that the relevant facts had been known to the defense from the beginning and that any suppression challenge to the contraband had been waived under Fed.R.Crim.P. 12(f).[3] Asked to explain the untimeliness of the motion, defense counsel represented to the court that Nunez, against counsel's advice and perhaps without comprehending the full implications, had instructed counsel not to move to suppress the contraband but later changed his mind.
 
 
 10
 Without ruling on the government's waiver claim under Federal Rule of Criminal Procedure 12(f), relating to the untimeliness of the motion to suppress the contraband, the district court proceeded to consider the contraband-suppression claim based on the allegedly pretextual pat-down frisk.[4] Near the end of the suppression hearing itself, however, defense counsel insinuated the new contention that the contraband should be suppressed either on the basis of the pretextual pat-down frisk or an unconstitutionally prolonged detention.[5] The latter theory had neither been raised in the motion to suppress nor at the post-empanelment argument upon which the district court based its tacit decision to permit hearing on the contraband-suppression claim based on the theory that the pat-down frisk was unconstitutional. See supra notes 4 & 5. As a direct consequence of the belated insinuation of the prolonged-detention claim, the district court's attention was never fairly focused on the principal contraband-suppression theory presently advanced on appeal.[6]
 
 II
 DISCUSSION
 A. Duration of Detention
 
 11
 We first consider whether the suppression theory clearly asserted for the first time on appeal--that the surrender of the contraband was the product of an unconstitutionally prolonged detention--was waived. Criminal Rule 12(f) provides: "Failure by a party to raise defenses or objections or to make requests which must be made prior to trial, at the time set by the court pursuant to subdivision (c), or prior to any extension thereof made by the court, shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver." Fed.R.Crim.P. 12(f) (emphasis added).[7] See United States v. Gomez, 770 F.2d 251, 253 (1st Cir.1985) (Rule 12 implements an "important social policy"; waiver results absent compliance); see also Brooks v. United States, 416 F.2d 1044, 1047-48 (5th Cir.1969) (same), cert. denied, 400 U.S. 840, 91 S.Ct. 81, 27 L.Ed.2d 75 (1970). The record reflects that the district court neither found "cause" nor granted relief from waiver under Rule 12(f).[8]
 
 
 12
 Even though appellate courts on occasion have implied relief from waiver under Rule 12(f) where the trial court proceeds to address the suppression issue on the merits, see, e.g., United States v. Vasquez, 858 F.2d 1387, 1389 (9th Cir.1988), cert. denied, 488 U.S. 1034, 109 S.Ct. 847, 102 L.Ed.2d 978 (1989); contra United States v. Oldfield, 859 F.2d 392, 396-98 (6th Cir.1988), we have not had occasion, nor are we disposed, sua sponte, to conjure relief from waiver under Rule 12(f) in circumstances where no cause for relief appears and the district court record does not enable reliable appellate review on the merits.
 
 
 13
 First, it would make Rules 12(b)(3) and (f) meaningless were an unexplained change of mind on the part of the defendant deemed "cause" for relief from waiver, following jury empanelment, under a rule fundamental to orderly pretrial procedure. In this vein, it is instructive to contrast the circumstances surrounding the late requests to suppress the contraband and the Nunez admission. The government's failure to disclose the Nunez admission until shortly before trial provided a paradigmatic example of "cause" for relief from waiver under Rule 12(f). See, e.g., United States v. Lamela, 942 F.2d 100, 104 (1st Cir.1991) (holding that a Rule 12(b)(2) motion first asserted at trial was not time-barred where the relevant information did not become available until trial). On the other hand, no extrinsic justification whatever is suggested for the belated request to suppress the contraband due to the duration of the detention even though all the relevant facts were known to the defense from the outset. Instead, the untimeliness is attributed exclusively to Nunez's original decision not to challenge the contraband. In these circumstances, we believe something more than an unexplained change of mind must be shown to warrant relief from a Rule 12(f) waiver brought on by the defendant's tactical decision. See United States v. Gonzales, 749 F.2d 1329, 1336 (9th Cir.1984) (upholding denial of relief from waiver under Rule 12(f) after defendant changed mind about whether to move to suppress).
 
 
 14
 Second, Rule 12 itself provides that the court shall not defer a pretrial motion for determination at trial, even for "good cause" shown, "if a party's right to appeal is adversely affected." Fed.R.Crim.P. 12(e). "Once a jury has been sworn and jeopardy attaches, the government loses its right to appeal an adverse ruling on suppression." United States v. Taylor, 792 F.2d 1019, 1025 (11th Cir.1986) (scope of discretion to grant relief under Rule 12(f) narrows once jeopardy has attached), citing 18 U.S.C. Sec. 3731,[9] cert. denied sub nom. King v. United States, 481 U.S. 1030, 107 S.Ct. 1957, 95 L.Ed.2d 530 (1987). See United States v. Barletta, 644 F.2d 50, 54 (1st Cir.1981) (Coffin, C.J.) ("[D]efendants' motions to suppress, based on the exclusionary rule, are at the heart of the legislative purpose in providing government appeal rights."). On the other hand, the defense tactic employed below would have insulated from pretrial review, pursuant to 18 U.S.C. Sec. 3731, any exclusionary ruling based on the duration of the detention. As our court clearly explained in Barletta, 644 F.2d at 54-55:
 
 
 15
 Were a defendant able to delay such a motion until trial, he could prevent the government from appealing, thus frustrating the central purpose of Sec. 3731. It is for this reason that motions to suppress--motions based on the exclusionary rule alone--must be made by a defendant prior to trial or not at all, and for this reason as well that a district court ordinarily may not defer a ruling on a defendant's motion to suppress. We agree with the district court that such rulings and the government's ability to appeal them are at the core of 12(e).
 
 
 16
 Under these circumstances, therefore, relief from waiver of the Nunez suppression claim based on the duration of the detention will not be implied. See id. at 54; see also, e.g., United States v. Gomez-Benabe, 985 F.2d 607, 611-12 (1st Cir.1993) (finding Rule 12(f) waiver and concluding that: "[i]t is unnecessary to address the substantive aspects of appellant's arguments [that should have been raised in a pretrial motion to suppress] since appellant has totally failed to put the matter in issue.").[10]B. Pat-down Frisk
 
 
 17
 Lastly, Nunez argues that the pat-down frisk conducted by Customs was pretextual--a search for contraband rather than a security frisk for weapons--and that the contraband subsequently recovered by Customs therefore should have been suppressed under Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Nunez insists that the Customs agents could not have apprehended a genuine security risk warranting a pat-down frisk for weapons at the INS checkpoint because he had just passed through the security checkpoint without incident. See supra note 1. Furthermore, he argues, the Customs agents would have searched his carry-on bag as well were they genuinely concerned for their personal security as the government asserts.[11]
 
 
 18
 The trial court is required to assess "the totality of the circumstances" confronting the officers, rather than dissecting the evidence and weighing the individual components. United States v. Trullo, 809 F.2d 108, 111 (1st Cir.), cert. denied, 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987). We review its factual findings under the "clear error" standard, United States v. Kiendra, 663 F.2d 349, 351 (1st Cir.1981); see also United States v. Walker, 924 F.2d 1, 3 (1st Cir.1991) (pat-down frisk), and will uphold the suppression ruling if supported by "any reasonable view of the evidence," United States v. Young, 877 F.2d 1099, 1100 (1st Cir.1989) (citing cases).
 
 
 19
 The district court based its findings principally on the agents' testimony concerning the reasons for the pat-down frisk. Trial court credibility determinations are prime candidates for appellate deference. See United States v. Brum, 948 F.2d 817, 819 (1st Cir.1991); cf. Anderson v. Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). The suppression hearing transcript discloses abundant support for the district court finding that the pat-down frisk was based on a reasonable concern, on the part of the agents, for their own security and for the safety of airline passengers.[12] As the record evidence supports the district court's reasoned conclusion, there was no error.
 
 
 20
 Affirmed.
 
 
 
 [1]
 Nunez walked through the metal detector and passed his carry-on bag through the x-ray machine
 
 
 [2]
 The record is silent as to whether any previous attempt had been made to obtain a drug-detection dog. The record does disclose, however, that the only dog available at the airport that Sunday afternoon, "Oby", was used for luggage screening and was considered too dangerous for use on a human subject, as it was trained to claw at the spot where it detected narcotics. "Zulu," the nearest "passive" drug-detection dog, was kenneled forty-five minutes from the airport. Zulu and her handler arrived at the airport at approximately 7:00 p.m., about one-half hour after Nunez was formally arrested
 
 
 [3]
 Given the timing of its disclosure, however, the government conceded the timeliness of the motion to suppress the Nunez admission to Ruiz. Nunez has not appealed from the district court ruling denying the motion to suppress the admission
 
 
 [4]
 The district court thus tacitly allowed argument and evidence on the contraband-suppression issue, which it had been led to understand turned on the allegedly pretextual pat-down frisk, the only claim raised in the motion to suppress the contraband
 
 
 [5]
 During cross-examination of the Customs agents, defense counsel elicited testimony relating to the frisk and the ensuing detention. Then, in a staccato presentation near the end of the suppression hearing, defense counsel--for the first time--briefly injected the claim that the excessive duration of the detention had tainted the voluntariness of Nunez' surrender of the contraband. With the empaneled jury waiting, the district court simply noted the customs agents' testimony that Nunez had been detained pending the issuance of a warrant authorizing the DEA to search his person. Defense counsel then countered that the government had presented no evidence that the agents had even attempted to obtain a warrant. Thereupon, the court's attention was once again abruptly drawn back to the legality of the pat-down frisk. Ultimately, the court denied the motion to suppress, in its entirety, without stating any "essential findings" relating to the duration of the detention as contemplated by Fed.R.Crim.P. 12(e)
 
 
 [6]
 The principal by-products of these scattershot defense tactics are the absence of factual findings on matters essential to reliable appellate review of the district court's ruling that the surrender of the contraband was voluntary, and the absence of any ruling or finding whatever as to the reasonableness of the detention itself. See Fed.R.Crim.P. 12(e)
 
 
 [7]
 Rule 12(b)(3) mandates that all motions to suppress be presented prior to trial; Rule 12(c) empowers the court, by rule or order, to prescribe time limits for filing Rule 12 motions. Fed.R.Crim.P. 12(b)(3), (c)
 
 
 [8]
 At the hearing reluctantly convened by the trial judge following jury empanelment, defense counsel obliquely raised arguments altogether distinct from those presented in the motion to suppress the contraband. See supra notes 4 & 5. We have made it crystal clear that "[l]egal arguments cannot be interchanged at will." United States v. Lilly, 13 F.3d 15, 18 (1st Cir.1994); United States v. Dietz, 950 F.2d 50, 55 (1st Cir.1991) ("We repeatedly have ruled ... that arguments not seasonably addressed to the trial court may not be raised for the first time in an appellate venue.") (emphasis added). See also United States v. Bailey, 675 F.2d 1292, 1294 (D.C.Cir.) (similar), cert. denied sub nom. Walker v. United States, 459 U.S. 853, 103 S.Ct. 119, 74 L.Ed.2d 104 (1982); accord, United States v. Dewitt, 946 F.2d 1497, 1502 (10th Cir.1991) ("[W]aiver provision applies not only to the failure to make a pretrial motion, but also to the failure to include a particular argument in the motion.") (emphasis added), cert. denied sub nom. Rison v. United States, --- U.S. ----, 112 S.Ct. 1233, 117 L.Ed.2d 467 (1992). The Trojan Horse tactic employed by the defense below virtually ensured that its suppression claim based on the duration of the detention would escape serious focus from the government and the court at the post-empanelment suppression hearing, see supra notes 4, 5 & 6, thereby circumventing the time bar fixed in the pretrial order, see supra note 7, the "cause" showing required for relief from waiver under Fed.R.Crim.P. 12(f), and the government's right to compel resolution of the contraband-suppression claim prior to trial in order to preserve its right to pretrial review under 18 U.S.C. Sec. 3731. See note 9 infra; see also United States v. Barletta, 644 F.2d 50, 54 (1st Cir.1981)
 
 
 [9]
 The relevant portion of 18 U.S.C. Sec. 3731 reads as follows:
 An appeal by the United States shall lie to a court of appeals from a decision or order of a district courts [sic] suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information.... (footnote omitted).
 
 
 [10]
 Few courts have squarely considered whether a Rule 12(f) waiver obviates "plain error" review under Rule 52(b). See, e.g., United States v. Howard, 998 F.2d 42, 52 (2d Cir.1993); but see Gomez-Benabe, 985 F.2d at 611-12. A number of courts have proceeded with "plain error" review, however, without discussing the impact of the Rule 12(f) waiver. See, e.g., United States v. Gio, 7 F.3d 1279, 1285 (7th Cir.1993) (severance claim waived under Rule 12(f) reviewed for plain error); United States v. Milian-Rodriguez, 828 F.2d 679, 684 (11th Cir.1987) (same, motion to suppress), cert. denied, 486 U.S. 1054, 108 S.Ct. 2820, 100 L.Ed.2d 921 (1988). In a different context, we have suggested that "plain error" review may be required, notwithstanding waiver. See, e.g., United States v. Cyr, 712 F.2d 729, 735 n. 4 (1st Cir.1983) (noting that reversal on severance claim waived under Rule 12(f) would be "mandated only if there is plain error.") (dicta). In any event, our precedent does not require "plain error" review in circumstances where reliable review has been rendered impossible by inadequate development at the district court level and the exclusionary-rule suppression issue pressed on appeal was not broached below until after jeopardy attached. See Barletta, 644 F.2d at 54-55. See also United States v. Davenport, 986 F.2d 1047, 1048 (7th Cir.1993)
 The record in this case would not enable a reliable appellate determination as to the reasonableness of the Custom's agents' actions in light of all the relevant circumstances prevailing at the time. See, e.g., United States v. Quinn, 815 F.2d 153, 157-58 (1st Cir.1987). Although the record certainly is susceptible to the interpretation that approximately two hours elapsed before Nunez was formally arrested, it is neither "obvious" nor "clear," see United States v. Olano, --- U.S. ----, ----, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993), for instance, that the actual circumstances confronting the officers did not render the detention reasonable; that the detention did not constitute a reasonable border detention; or, indeed, that the officers did not have probable cause at some point prior to the formal arrest. Thus, Nunez has not met the burden of proving plain error, even assuming such review were appropriate in the wake of the deliberate Rule 12(f) waiver. See United States v. Olivier-Diaz, 13 F.3d 1, 5 (1st Cir.1993) ("[E]rror cannot be 'clear' or 'obvious' unless the desired factual finding is the only one supported by the record below."); United States v. Petrozziello, 548 F.2d 20, 22 (1st Cir.1977) ("Appellant's failure to raise the issue below means that a critical factual dispute remains unsolved. We cannot find plain error on this silent record.").
 
 
 [11]
 Agent Rivera testified that there was no need to search the carry-on bag at the security checkpoint, because the officers would have Nunez within their direct physical control and, unlike a weapon concealed on his person, he would not be able to remove a gun from his carry-on bag before the officers could subdue him. We believe Rivera's testimony was sufficient to dispel the misgivings raised by Nunez
 
 
 [12]
 Nunez's nervous behavior, the stiff manner in which he walked, the difficulty in bending, and the bulges underneath his clothing were sufficient to raise a reasonable suspicion in the minds of experienced law enforcement officers that Nunez was carrying contraband. See United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (totality of circumstances must be considered in determining whether there was "reasonable suspicion" for Terry stop, which must be based on "articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause.") In addition, the district court specifically credited testimony that certain explosive devices could have gone undetected when Nunez passed through the airport security checkpoint. Considering that these events took place in the environs of an international airport where drug trafficking has been a common occurrence in recent years, see, e.g., United States v. Villanueva, 15 F.3d 197, 199 (1st Cir.1994) (noting history of area where defendants were stopped is relevant factor in "reasonable suspicion" calculus), we believe the district court supportably found that these agents reasonably harbored a justifiable concern for their personal safety and/or the safety of airline passengers, sufficient to warrant the pat-down frisk for weapons and for any explosives which may have passed undetected through the INS checkpoint