# United States Court of Appeals
## For the First Circuit

No. 99-1872

UNITED STATES OF AMERICA,

Appellee,

v.

OLA BASHORUN, a/k/a TONY JOHNSON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Lynch, Circuit Judge,

Cyr, Senior Circuit Judge,

and Lipez, Circuit Judge.

Peter B. Krupp, with whom Lurie & Krupp, LLP was on brief for appellant.

Theodore D. Chuang, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief for appellee.

August 28, 2000

---

**CYR, <u>Senior Circuit Judge</u>.** While reserving the right to appeal the district court ruling rejecting his pretrial motion to suppress the fruits of a warrantless arrest, <u>see</u> Fed. R. Crim. P. 11(a)(2), appellant Ola Bashorun entered conditional guilty pleas to various criminal charges stemming from his participation in a drug-distribution conspiracy. We now affirm the district court ruling.

## I

## <u>BACKGROUND</u>

On November 7, 1997, United States Customs authorities intercepted an Express Mail package containing concealed heroin en route from Thailand and addressed to one "Keisha (sic) Barrows" at 1019 Beacon Street, Apartment 43, in Brookline, Massachusetts. Customs agents promptly contacted Timothy Leighton, the landlord at 1019 Beacon Street, and learned that a man named Tony Johnson — identified following his arrest as Bashorun — had rented Apartment 43 continuously since January 1997. Leighton described Tony Johnson as a black man in his thirties, with an accent, who drove a late model car and wore expensive jewelry, but had no apparent means of employment. Leighton stated that Tony Johnson had introduced him to a friend, also named "Tony," who lived in Cambridge [hereinafter: "Tony from Cambridge," identified following his arrest as

3

Bashorun's codefendant Anthony Junaid], whom Leighton likewise described as a black man, with an accent, who wore expensive jewelry.

When Tony Johnson left Apartment 43 in September 1997, Leighton allowed Johnson's girlfriend, Keesha Barrows, to move in for two weeks, followed by Felicia Brown ("Tony from Cambridge"'s girlfriend) and her mother. Throughout this period, Tony Johnson remained the only tenant of record and his name continued to appear on the doorbell directory to Apartment 43. The apartment <u>telephone</u> <u>number</u>, however, had been listed under such names as "Gubril Abediran" and "Tashema Beard," but never in Tony Johnson's name. In addition, telephone company records revealed that one Desmond Bartley, under investigation by the United States Drug Enforcement Agency in Baltimore for having received packages of heroin from a "Tony Johnson," had placed ten telephone calls to Apartment 43 during February and March, 1997.

## A. The Events of November 11

While the package addressed to "Keisha (sic) Barrows" remained with customs authorities, it had been fitted with an electronic monitoring device before being delivered to Apartment 43 on November 11, 1997. As U.S. Postal Inspector Nicole Gray, posing as a postal carrier, entered 1019 Beacon Street,

4

undercover agents were maintaining surveillance from both inside and outside the building. These agents observed that Inspector Gray was being followed by a black male who kept looking at the package Inspector Gray was carrying.

The landlord met the black male and promptly alerted the surveillance agents that he recognized him as Tony Johnson's friend, "Tony from Cambridge." This information was radioed to agents outside the apartment building, who then observed the black male (i.e., "Tony from Cambridge") as he exited the apartment building and entered a blue Dodge Caravan parked immediately in front of the apartment building.

While "Tony from Cambridge" was still inside 1019 Beacon Street, customs agents stationed outside the building, including Agents McGrath and Donald Lenzie, observed that another black male, with a moustache, was using a pay phone on the opposite side of Beacon Street. At about the same time, Leighton received a phone call from Tony Johnson, who said he would be dropping by the apartment later to pay the rent. Surveillance agents watched the caller hang up the payphone, cross Beacon Street, and enter the blue Dodge Caravan on the passenger side.

The blue Dodge Caravan, tailed by agents, then proceeded behind the Brookline post office building where

5

Inspector Gray had driven the postal truck after unsuccessfully attempting to make the controlled delivery of the "Keisha (sic) Barrows" package at 1019 Beacon Street. Massachusetts Bay Transportation Authority Detective Peter Pasciucco continued to tail the blue Caravan for an hour after it left the post office, and at one point observed that one of the two black males was using a cellular phone.

Meantime, back at 1019 Beacon Street, Leighton made and received a series of telephone calls. Fifteen minutes after the blue Caravan left 1019 Beacon Street, "Tony from Cambridge" called to learn the identities of the people who had been in the lobby earlier (viz., the undercover surveillance agents). Leighton told him they were electricians.

More than two hours later, at the direction of law enforcement agents, Leighton called Tony Johnson's cellular phone and "Tony from Cambridge" answered. When Leighton told him about the attempt to deliver the package to Apartment 43 earlier that morning, "Tony from Cambridge" repeatedly asked Leighton to sign for the package the next time a delivery was attempted, and advised Leighton that Tony Johnson would pick it up later from Leighton. At this point, "Tony from Cambridge" volunteered the information that Keesha Barrows owed Tony Johnson money and that the package probably was a birthday gift to Barrows. Leighton again refused to sign for the package.

Within the next half hour, Leighton received two telephone calls from Tony Johnson, requesting that he sign for the package and parroting "Tony from Cambridge"'s earlier phone conversation with Leighton by stating that Keesha Barrows owed Tony Johnson money and that the package must be a birthday gift for Barrows. Leighton again refused to sign for the package

7

addressed to Barrows.

## B.    The Events of November 12

At 8:45 the following morning, agents spotted the same blue Caravan parked near 1019 Beacon Street, and later near the Brookline post office.  At about the same time, the post office received two anonymous telephone calls inquiring about the package addressed to Barrows.  When the blue Caravan left the post office, the agents tailing it observed what appeared to be evasive maneuvers, such as U-turns and driving against traffic on one-way streets.

Shortly, Inspector Gray left the post office and drove to 1019 Beacon Street in an effort to attempt another controlled delivery.  At the time, Detective Pasciucco was parked on Park Drive, around the corner from, though not in direct line of sight of, 1019 Beacon Street.  At this point Pasciucco observed the blue Caravan as it turned onto Park Drive, passed his vehicle, and turned onto Beacon Street heading toward No. 1019.  Pasciucco identified the occupants as the same two men whom he had seen in the blue Caravan the previous morning.  When the blue Caravan parked across the street from 1019 Beacon, Agent Lenzie identified its two occupants as the same two black men he had seen in the blue Caravan on November 11.

A short time later, Keesha Barrows arrived and parked her vehicle behind the postal delivery truck.  As Inspector Gray

left the apartment building with the undelivered package, Keesha Barrows approached her, signed for the package, then placed it in her vehicle. The blue Caravan made a U-turn and pulled up behind the Barrows vehicle. At that point, Bashorun (aka "Tony Johnson"), Junaid (aka "Tony from Cambridge"), and Keesha Barrows were arrested pursuant to Agent McGrath's instruction.

A subsequent search of the blue Caravan, conducted incident to the warrantless arrests, disclosed several pieces of inculpatory evidence, including a cellular phone, documents reflecting the telephone numbers of Keesha Barrows and the Brookline post office, as well as the Express Mail tracking number for the package containing the contraband heroin.

In due course, Bashorun and Junaid were indicted for conspiring to possess heroin, with intent to distribute, see 21 U.S.C. § 846; possessing heroin, with intent to distribute, see id. § 841(a)(1); 18 U.S.C. § 2; five counts of utilizing a telephone to facilitate a drug offense, see 21 U.S.C. § 843(b); and one count of immigration fraud, see 18 U.S.C. § 1546(a).

Thereafter, Bashorun moved to suppress all evidence seized incident to his warrantless arrest, on the ground that "law enforcement officers did not have probable cause to arrest [him.]" Following a six-day evidentiary hearing, during which several law enforcement agents testified, the district court

10

denied the motion to suppress.

Subsequently, Bashorun arrived at a plea agreement with the government and entered a conditional guilty plea, pursuant to Federal Rule of Criminal Procedure 11(a)(2), reserving the right to appeal the district court order denying the motion to suppress the evidence seized pursuant to his warrantless arrest.

**II**

**<u>DISCUSSION</u>**

Bashorun now contends that his warrantless arrest was invalid because the record unequivocally demonstrates that Agent McGrath, who ordered the arrest, lacked contemporaneous knowledge of the critical fact that would have established probable cause to arrest the passenger in the blue Caravan on November 12: namely, that the same two persons were in the blue Caravan on both November 11 and 12. Instead, Bashorun argues, the record reveals that the only officer arguably in a position to make such an identification – Detective Pasciucco – did not communicate that information to Agent McGrath prior to the arrest.

Accordingly, Bashorun maintains that the evidence showed, at most, that he was "merely present" — <u>i.e.</u>, as a <u>passenger</u> — in the blue Caravan on November 12. Since the

present claim was never presented to the district court,[1] we will not entertain it on appeal.  See United States v. Torres, 162 F.3d 6, 11 (1st Cir. 1998), cert. denied, 526 U.S. 1057 (1999); United States v. Nuñez, 19 F.3d 719, 721-23 (1st Cir. 1994); see also United States v. Meraz-Peru, 24 F.3d 1197, 1198 (10th Cir. 1994).

As Bashorun points out, the precise contours of the fellow-officer rule have never been limned by this court:  for example, as to whether the "directing" officer (viz., Agent McGrath) personally need have known — through personal observation or verifiable information communicated by fellow officers — all facts necessary to demonstrate probable cause, or whether the cumulative knowledge of all participating officers may be considered.  See United States v. Meade, 110 F.3d 190,

---

[1]Instead, in a January 8, 1998, memorandum of law supporting the motion to suppress, Bashorun simply set forth the so-called "fellow-officer" rule, which merely requires that the district court "determine whether 'at the moment the arrest was made' the 'facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [the suspect] had committed or was committing an offense.'" (Emphasis added.)  Thus, in the district court Bashorun essentially contended simply that none of the officers involved in his arrest possessed sufficient evidence to establish probable cause.  At no point did he contend that Agent McGrath — qua "directing" law enforcement officer — lacked the requisite information to support the probable cause assessment.

12

194 (1st Cir. 1997).[2]  Bashorun nonetheless urges that we now reach out for the controversial question bypassed in Meade and adopt the rule that the prosecution must establish that the supervising officer possessed all the requisite probable-cause data, rather than simply presume that subordinate officers would have communicated their collective knowledge to their

---

[2]Meade states in dicta:

> The fellow officer rule underlies the well-worn maxim that "the collective knowledge and information of all the officers involved establishes probable cause for the arrest."  The "collective knowledge" or "pooled knowledge" principle has been used to validate arrests in two ways: (1) by tracing the arresting officer's action back to an individual in a law enforcement agency who possessed information sufficient to establish probable cause, and (2) by finding that the directing agency as a whole possessed the necessary facts.
>      A sensible argument has been made that looking to the agency's knowledge as a whole is unwise because it may "encourage the dissemination of arrest orders based upon nothing more than the hope that the unevaluated bits and pieces in the hands of several different officers may turn out to add up to probable cause."  In the same vein, the collective-knowledge corollary of the fellow officer rule would seem to require, or at least presuppose, the flow of information from the officers with knowledge of facts tending to establish probable cause to those lacking that knowledge (or, at least, to the directing or arresting officer).

Meade, 110 F.3d at 194.

13

supervisor.

The legal theories Bashorun advances on appeal were never raised in the district court, where he neither cited Meade nor the controversy it identified, instead simply asserting that the "officers" involved did not have probable cause for the arrest. Now, however, he attempts to rely upon the altogether different theory that even assuming the subordinate officers possessed the requisite information to establish probable cause, it was never communicated to Agent McGrath, who made the probable-cause assessment.

Given these lapses and the consequent absence of a sufficiently developed evidentiary record, the Meade-based claims asserted on appeal are deemed waived. See Nuñez, 19 F.3d at 722 (holding, pursuant to Fed. R. Crim. P 12(f), that litigant waives issue not raised in pretrial motion to suppress, except for "cause" shown); see also United States v. Collazo-Aponte, 216 F.3d 163, ___ (1st Cir. 2000) [No. 98-1808, 2000 WL 801271, at *15 (1st Cir. June 27, 2000)]; Torres, 162 F.3d at 11 ("A litigant [seeking to suppress evidence] cannot jump from theory to theory like a bee buzzing from flower to flower.").

Bashorun offers various rejoinders to the waiver suggestion. First, he asserts that "the issue of which person had knowledge of the facts constituting probable cause was

14

always before the district court," citing the following statement by the Assistant United States Attorney:

> We started this [suppression hearing] with the notion that we were going to ask this witness [Agent McGrath], who made the arrest decision, what he knew.  And we were very focused that what he knew was the focus of this hearing. . . . The only issue, [] it seems to me, is what this witness [Agent McGrath] knew and the cross-examination of that witness. . . . What the defense wants to do now is find out every witness who ever made an observation, apparently whether or not it was communicated to McGrath.

The quoted excerpt is unavailing, however, for two principal reasons.

First, we enforce Rule 12(f) waivers even though the district court ultimately did address the waived issue on the merits, unless the appellant can show "cause" for failing to raise it in a pretrial motion.  See Nuñez, 19 F.3d at 722. Bashorun has attempted no such showing.

Second, Bashorun wrenches the prosecutor's remarks from their context.  During the McGrath cross-examination at the suppression hearing, defense counsel represented to the district court:  "[T]his witness knows some things that some people have told him but doesn't know a lot about what those people, in fact, saw."  Further, defense counsel suggested that other law enforcement officers, such as Agent Lenzie and Detective Pasciucco, should be called as witnesses so that "the Court can

15

adequately assess the reliability of the tremendous amount of hearsay evidence that [Agent McGrath] has provided."

Over the government's objection, the district court agreed, explaining that if one of Agent McGrath's <u>fellow officers</u> were to offer testimony — concerning his observations on November 11 or 12 — which was not consistent with Agent McGrath's testimony as to what that officer had told him, then McGrath's credibility could be called into question. Fairly viewed in context, therefore, the prosecutor's objection went simply to the unanticipated expansion of the witness list because "the defense has been trying mightily to discover the entire case two weeks before trial," and because the prosecutor believed that defense counsel had been afforded adequate opportunity to test Agent McGrath's credibility through cross-examination.

Moreover, at no point in the entire exchange did counsel suggest that the defense was interested in calling additional witnesses to determine whether they had communicated their observations to Agent McGrath, but rather to determine what they had observed. Thus, the defense not only failed to present even a subliminal Meade claim, but left entirely open the clear impression imparted in its pretrial motion that its principal contention was that none of the individual officers possessed sufficient facts to establish probable cause. Accordingly, the ensuing statements by the prosecutor and the district court fairly cannot be construed as concessions that probable cause properly could be established only through the knowledge possessed by Agent McGrath.

Next, Bashorun points out that he proposed the following findings of fact following the suppression hearing:

> 1. The only two law enforcement agents involved in the investigation on both November 11 and 12, 1997 who had an opportunity to see the occupants of the blue Dodge Caravan before the arrest were Agents Lenzie and Pasciucco. Agent McGrath did not see the occupants of the Caravan until after the arrest on November 12.

> 2. Prior to the arrest, Agent Pasciucco made no radio transmissions that the occupants were the same on November 12 as he had observed on November 11. Agent Pasciucco did not testify that he was aware prior to the arrest of any observations of "evasive" driving by the Caravan on November

17

12.

> 3. By the time he discontinued his surveillance on November 11, 1997, Agent Lenzie had only observed one of the two occupants of the Dodge Caravan. He did not see the other, if in fact there was another, occupant of the Caravan on November 11. Because he only saw one person in the Caravan on November 11, he was in no position to say that the two occupants of the Caravan were the same on November 11 and 12.

Consequently, Bashorun argues, "[t]here would have been no reason [to ask] for such findings if all of the information known to the surveillance agents could be added together to determine if probable cause to make an arrest existed."

Once again we disagree, for the simple reason that the credibility of Agent Lenzie and Detective Pasciucco regarding their observations was at least as relevant to the non-Meade defense theory asserted in Bashorun's pretrial motion to suppress. That is, if Detective Pasciucco did in fact make the November 12 observation to which he testified, Bashorun's pretrial contention that none of the officers involved had sufficient facts to establish probable cause would be undermined.

Thus, for example, the district court reasonably may have construed Proposed Finding 2 — viz., that "[p]rior to the arrest, Agent Pasciucco made no radio transmissions that the

occupants were the same on November 12 as he had observed on November 11" — as a challenge to the credibility of Detective Pasciucco's observation (as contrasted from his communication of it to McGrath), since it would be reasonable to expect that if Pasciucco truthfully testified that he had made so crucial an observation, in all likelihood he would have communicated it to his fellow officers.  As Pasciucco did not communicate it, however, Bashorun invited the district court to find that he never made the observation at all.

Importantly, the district court interpreted Proposed Finding 2 in precisely this fashion, as demonstrated by the fact that it made no finding whatsoever as to whether either Agent Lenzie or Detective Pasciucco had communicated their respective observations to fellow officers. See United States v. Bashorun, No. 97-CR-10318, at 16-17 (D. Mass. Jan. 5, 1999) (expressly "credit[ing]" Agent Lenzie's and Detective Pasciucco's observations of November 12 that the same two men were in the blue Caravan on November 11 and 12, but making no mention or finding as to whether they communicated their observations to fellow officers).

Quite clearly and understandably, therefore, the district court did not consider the issue of inter-officer communication material to the proffered defense, except as it

19

might pertain to the entirely discrete matter of the credibility of the testimony provided by Lenzie and Pasciucco regarding their <u>observations</u>.[3]

Bashorun nevertheless argues that any waiver must be excused since the district court addressed the <u>Meade</u> issue on the merits, as reflected in the following statement in its opinion:

> [E]vidence supporting probable cause can be cumulative: "[L]aw enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime." <u>United States</u> v. <u>Meade</u>, 110 F.3d 190, 193 (1st Cir. 1993) . . . .

<u>United States</u> v. <u>Bashorun</u>, No. 97-CR-10318, at 18 (D. Mass. Jan. 5, 1999). This claim fails as well.

First, as previously noted, Rule 12(f) waivers are not excused simply because the district court may have addressed the waived issue on the merits. <u>See</u> <u>Nuñez</u>, 19 F.3d at 722.

Second, it strains credulity to suggest that the district court meant to resolve the controversial <u>Meade</u> issue in a single, unelaborated, prefatory sentence. Instead, as evidenced by its appearance at the very outset of the district

---

[3]Moreover, in addition to the initial waiver, Bashorun submitted proposed conclusions of law following the evidentiary hearing, without once mentioning or citing <u>Meade</u>.

20

court's legal analysis, this sentence simply set forth the probable cause precepts applicable where multiple law-enforcement officers are involved in a warrantless search or seizure.

Third, at no point did the district court even remotely purport to acknowledge that the defense intended to litigate any inter-officer communication claim. Were it otherwise, we think it would be reasonable to expect that the district court would have quoted the Meade dicta presently touted by Bashorun on appeal, in which we discussed whether communication of the knowledge acquired by individual officers may be presumed, or whether proof of inter-officer communications is even required under the "fellow-officer" rule. See supra note 2. The district court's silence on these weighty matters speaks volumes.

21

Finally, Bashorun argues that for us to find a Rule 12(f) waiver would breach the promise made in the plea agreement that he could appeal the denial of the suppression motion. As this argument rests on the incorrect assumption that "[t]he district court's order squarely addresses the issue raised on appeal[,]" it fails as well.

When the government entered into the plea agreement with Bashorun, it was entitled to assume, as the law plainly provides, that only arguments duly presented to the district court would be deemed preserved for appeal. Although Bashorun cites case law holding that the government must scrupulously perform all promises made in its plea agreements, there is no authority for the view that it implicitly promises that a Rule 11(a)(2) appellant shall have the legal right to insist that legal theories waived below are nevertheless to be considered preserved for appeal.

As we have done in the past, we now bypass the issue as to whether "plain error" review is available, see Nuñez, 19 F.3d at 723 n.10 (bypassing question and finding no plain error), and instead accord Bashorun the benefit of that standard of review. See United States v. Olano, 507 U.S. 725, 732-33 (1993)) (requiring that appellant prove that error is "plain" or "obvious" and affects substantial rights, and that appellate

22

court determine, in its discretion, that error "seriously affected the fairness, integrity or public reputation of judicial proceedings"); Fed. R. Crim. P. 52(b).

We have noted the difficulty confronting defendants "where reliable review has been rendered impossible by inadequate [factual] development at the district court level." Nuñez, 19 F.3d at 723 n.10. More to the present point, the defense failure to invite the district court's attention to the inter-officer communications issue resulted in a virtually total absence of essential factual findings relating to the merits. Consequently, critical factual questions remain both ambiguous and conflicted.

For example, Detective Pasciucco ambiguously testified initially that he had made no radio communication on November 12 after observing the blue Caravan on Park Drive. Later, however, he allowed that he could not remember. Agent McGrath, on the other hand, initially testified that Detective Pasciucco had reported to him that the occupants in the blue Caravan were "the same persons as the day before." Later, however, Agent McGrath testified that he had received a radio communication from someone after the blue Caravan pulled up in front of 1019 Beacon Street on November 12, advising that the blue Caravan occupants were "the two black males that had been in it for two days." The latter communication would have taken place immediately after Detective Pasciucco observed the blue Caravan turn from Park Drive onto Beacon Street.

Thus, it cannot be seriously suggested that the present record makes it either "obvious" or "clear" whether these pivotal communications took place. Accordingly, Bashorun cannot demonstrate plain error under any scenario. See Nuñez, 19 F.3d at 723 n.10 ("'[E]rror cannot be "clear" or "obvious" unless the desired factual finding is the only one supported by the record below.'") (citation omitted).

Finally, ample additional grounds preclude any "plain error" finding. See United States v. Diallo, 29 F.3d 23, 25 (1st Cir. 1994) ("[P]robable cause should be determined under a 'totality-of-the-circumstances' test . . . [and] 'is a fluid concept – turning on the assessment of probabilities in particular factual contexts.' . . . 'The substance of all the definitions of probable cause is a reasonable ground for belief of guilt. And this means less than evidence which would justify condemnation or conviction.'") (citations omitted).

The argument advanced by Bashorun on appeal rests entirely on the premise that the visual identifications of the passengers in the blue Caravan on two successive days was the critical evidence without which there could have been no probable cause for their arrests. As the district court aptly observed, however, and the record amply demonstrates, see supra Section I, Agent McGrath was in possession of a far broader web

25

of inculpatory evidence having little to do with whether Bashorun (aka "Tony Johnson") was the passenger in the blue Caravan on November 11 and 12. For instance, there was no dispute that the blue Caravan made highly suspicious movements on both days, traveling from 1019 Beacon Street to the Brookline post office, then making evasive maneuvers while followed by law enforcement officers. See United States v. Bashorun, No. 97-CR-10318, at 16-17 (D. Mass. Jan. 5, 1999) (noting "suspicious" movements of blue Caravan). Consequently, the very least that can be said is that a finding that the passenger in the blue Caravan on November 12 was "merely present" most certainly was not compelled. See, e.g., Meade, 110 F.3d at 198-99 (affirming finding of probable cause to arrest passenger in vehicle, occupied by attempted-robbery suspects, which made suspicious maneuvers; noting as well that "these facts reveal 'substantially more than a momentary, random, or apparently innocent association'"); United States v. Martinez-Molina, 64 F.3d 719, 729 (1st Cir. 1995) (affirming finding of probable cause to arrest defendants who were members of large group selling drugs in park).[4]

---

[4]The district court identified several other factors material to the common-sense probable cause determination: (1) Leighton positively identified "Tony from Cambridge" as the man who tried to receive the package on November 11, and drove the blue Caravan that day; (2) Tony Johnson, the apartment lessee,

26

Accordingly, it simply cannot be seriously suggested that the probable-cause calculus indulged by the district court constituted <u>plain</u> <u>error</u>.

**<u>Affirmed</u>.**

---

had introduced "Tony from Cambridge" as his friend; and (3) both "Tony from Cambridge" and Tony Johnson spoke with Leighton by phone on November 11. As their conversations turned on uncannily similar and unorthodox themes (<u>e.g.</u>, Barrows owed Johnson money, and the package was a birthday gift for Barrows) that it would have been entirely reasonable to infer that the two Tonys, <u>i.e.</u>, the two occupants of the blue Caravan, were in close consultation.