# United States Court of Appeals

## For the First Circuit

No. 00-1680

UNITED STATES OF AMERICA,

Plaintiff, Appellee,

v.

MICHAEL E. TIERNEY,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

---

Before

Torruella, Circuit Judge,

Gibson,[*] Senior Circuit Judge,

and Lipez, Circuit Judge.

---

Francis J. DiMento, with whom Dimento & Sullivan and Jason A. Kosow were on brief, for appellant.
Ellen R. Meltzer, with whom Donald K. Stern, United States Attorney, Christopher L. Varner and Paul J. Andrews were on brief, for appellee.

---

October 2, 2001

---

[*] Hon. John R. Gibson, of the Eighth Circuit, sitting by designation.

**TORRUELLA, Circuit Judge.** Michael Tierney was convicted by a jury of one count of making a false statement to a federally insured financial institution in violation of 18 U.S.C. § 1014. He argues that there was insufficient evidence to sustain a conviction, and that the district court therefore erred in denying his motion for judgment of acquittal. After reviewing the record, we affirm.

### BACKGROUND

Tierney owned or controlled several businesses that maintained and serviced heating, plumbing and air conditioning systems, as well as engaged in general contracting and construction. One of those businesses, K & C Mechanical Contracting Corp. ("K & C"), maintained a $50,000 line of credit with Olympic International Bank & Trust Co. ("Olympic").[1] Tierney was a shareholder of Olympic and acted as the bank's director from its inception until his resignation in July 1991. On August 18, 1987, Tierney filed a Confidential Personal Financial Statement ("PFS") with Olympic in order to increase the K & C line of credit to $200,000. The increase was granted on August 21, 1987.[2]

The indictment alleged that the PFS was false in four respects. First, although Tierney's 1986 tax return indicated that the

---

[1] There is no dispute that Olympic's deposits were insured by the FDIC, as required by 18 U.S.C. § 1014.

[2] The August 1987 PFS at issue in this case was one of six Tierney filed between 1985 and 1990.

-3-

earned income attributable to him personally (as opposed to his spouse) was $19,480, the PFS stated "salary, bonuses, and commissions" of $75,000 and total income of $90,000 for 1986. Second, Tierney represented that he was not a defendant to any legal actions at the time the PFS was filed. However, the government introduced evidence that, as of August 1987, two suits were pending against the defendant personally and one was pending against Tierney Contracting Corp. ("TCC"), a corporation wholly owned by Tierney.[3] Third, Tierney indicated on the PFS that his wholly-owned corporation Tierney Mechanical Contracting Corp. ("TMC") had a value of $150,000. The corporation's financial statement, however, indicated that TMC had a book value of negative $96,941, and the government introduced testimony by a loan officer indicating that the bank expected Tierney to use book value on the PFS. Fourth, Tierney indicated on the PFS that the title to 35 Grayfield Avenue (his personal residence) was in his name, when in fact it was in his wife's name.

At trial, Tierney sought to explain each of these errors. First, he testified that the salary amount he entered on the PFS had included $50,000 of predicted additional dividend income from K & C and

---

[3] Inca Development Corp. had sued Tierney personally, seeking $13,854 in labor and materials in connection with the construction of Tierney's residence. Boston Edison had sued Tierney personally, seeking $8,050 plus interest for unpaid electric bills. McGraw-Hill had sued TCC, seeking $475 in unpaid subscription amounts for a construction newsletter.

TMC not paid as of August 1987 but attributable to the 1986 tax year. Tierney introduced evidence that on September 16, 1987, K & C and TMC filed corporate tax returns indicating that over $40,000 in income potentially attributable to the 1986 tax year had been disbursed to him.[4] Tierney argued that, at the very least, these disbursements increased his 1986 salary and wages to $60,043, much closer to the $75,000 claimed on the PFS.[5] Tierney also pointed out that even the approximately $55,000 difference between his tax return and the PFS was minimal when compared to his net worth of over $2,000,000.

Second, although he admitted that the lawsuits in question were pending at the time of the PFS, Tierney maintained that he had not knowingly misrepresented their status. Regarding the McGraw-Hill suit, he noted that: (i) service was made on his secretary, rather than him

[4] Because the corporate tax statements were for the fiscal year ending October 31, 1986, the government argued that the money disbursed could have been attributable to 1985, rather than 1986. The government introduced no evidence from which to draw this conclusion, however, and does not contest that the disbursements could as likely have been attributable to 1986.

 A government witness also testified that the "compensation" listed on the corporate tax forms "could be" fringe benefits or other items that would not be included as salary or wages on a PFS. However, the government introduced no evidence from which a jury could conclude that such was the case here.

[5] Tierney also pointed to four items on his joint 1986 tax return that, if considered as personal income, exceeded by $1,970 the $15,000 reported on the PFS as "other income." As the government primarily focused on the salary discrepancy at trial, and because the additional "other income" claimed is relatively insubstantial, we do not address the strength of that evidence here.

personally; (ii) the subscription service had continued after the lawsuit, indicating that the deficit had been paid, but that the case had never been closed; and (iii) his answer that he was not a defendant was literally correct given that the suit was against the corporate entity TMC rather than against him personally. Tierney also testified that he had believed that the Inca Development suit had been closed in November 1986 upon the withdrawal of Inca's attorney; the fact that the suit remained open in January 2000 without any further action indicated that such a belief was reasonable. Finally, Tierney testified that he had never been personally served in the Boston Edison suit. Although Deputy Sheriff James Muscato (the government witness responsible for service in the case) had testified that it was his custom to serve defendants personally, Muscato could not identify Tierney as the person whom he served, and Muscato's record of the physical description of the person served had since been destroyed. Tierney also noted that the lawsuits totaled only $22,379.72, a small amount in comparison to the $2,000,000 net worth claimed in the PFS.

Third, Tierney testified that he had entered the "market value" of TMC on the PFS as opposed to its "book value," and that he was unaware that Olympic had expected him to use book value when listing assets. He also introduced evidence supporting the conclusion that it was reasonable for him to use market value on the PFS, including: (i) previous PFSs in which the value of TMC was entered

under a "market value" heading; (ii) the fact that the term "book value" did not appear anywhere on the PFS, while "market value" did, albeit only under the heading "U.S. Government and Marketable Securities"; (iii) Tierney's testimony that he had used, and been told to use, market value in the past; (iv) the testimony of John Duggan, his accountant, that he had told Tierney to use market value; and (v) the testimony of Olympic customer Joseph Maloney that he used market value on his PFS.

Fourth, Tierney claimed that he was confused about who held the title to the Grayfield Avenue property, because he had contributed significant amounts of his money and time in improving the property (by building a residence on it). Tierney noted that in a subsequent PFS filed in November 1988, he had corrected this error after learning that his wife in fact held title to the property.

## DISCUSSION

We review the district court's ruling de novo, viewing the evidence in the light most favorable to the government, to determine whether a rational jury could find the defendant guilty beyond a reasonable doubt. United States v. Reeder, 170 F.3d 93, 102 (1st Cir. 1999). Because credibility determinations are the province of the jury, we "ordinarily decline invitations to second-guess" jury decisions about the credibility of particular testimony, United States v. Carroll, 105 F.3d 740, 743 (1st Cir. 1997), and make all credibility

-7-

choices in favor of the verdict.  The evidence in support of the verdict need not be direct, but may be circumstantial in nature. United States v. Singh, 222 F.3d 6, 9 (1st Cir. 2000).  Where there is sufficient evidence, on the whole, to support the judgment of conviction, a jury is entitled to reject even plausible theories of innocence, and we are required to affirm that jury verdict.  United States v. Olbres, 61 F.3d 967, 972 (1st Cir. 1995).

To establish a violation of 18 U.S.C. § 1014, the government must prove that: (i) the defendant made a false statement to a bank; (ii) the defendant acted knowingly; and (iii) the false statement was made for the purpose of influencing the bank's actions on the loan. United States v. Colón-Muñoz, 192 F.3d 210, 225 (1st Cir. 1999).  The false statement need not be material, United States v. Wells, 519 U.S. 482, 489-99 (1997), although it will be relatively rare that a statement made for the purpose of influencing a bank's decision will not relate to a material matter, id. at 499.

If the government had only presented evidence as to the first three misrepresentations, this would be a much more difficult case. First, Tierney introduced evidence indicating that, despite the fact that his 1986 joint tax return listed his individual earned income as $19,480, his 1986 salary and wages exceeded $60,000 once the director's fees issued in late 1987 were included.  Although this amount was admittedly short of the $75,000 listed on the PFS, to convict on this

basis alone the jury would have had to conclude that Tierney purposely overestimated his income by $15,000 in order to influence a bank loan, despite the fact that he was a director of the bank and had a claimed net worth of over $2,000,000.[6] Even the $55,000 exaggeration of Tierney's income argued by the government is of relatively minor magnitude in comparison to his claimed net worth.

There is also sufficient evidence to indicate that Tierney was aware that he was a defendant in several lawsuits (at least the two filed against him in a personal capacity). Given the relatively minor amounts of money at stake and Tierney's claimed net worth, however, it is difficult to believe that $22,379 in potential liability would have, by itself, influenced Olympic's decision to grant the extension of credit.[7] For that reason, it is unlikely (although not impossible) that Tierney made such a misrepresentation for the purpose of influencing Olympic's decision. Wells, 519 U.S. at 499.

---

[6] We do not doubt that misrepresentations of income are the type of false statements that ordinarily would be made for the purpose of influencing bank decisions. See, e.g., United States v. Thompson, 811 F.2d 841, 845-46 (5th Cir. 1987).

[7] Olympic's loan officer testified that it was important to the loan process for a borrower to disclose if he was a defendant because an adverse judgment could affect his net worth. We do not doubt that this is true, and that a jury could credit that this information was important to a bank's decision-making. Cf. United States v. Bellucci, 995 F.2d 157, 159 (9th Cir. 1993) (relevance of litigation to loan determination decision). However, we note that it is only common sense that both the existence and the amount of such claims are relevant to a bank's decision.

The allegation that Tierney's use of market value instead of book value was a misrepresentation is particularly weak. Previous PFSs introduced into evidence showed that market value is a common method of listing an asset's worth, even when shares of that corporation are not traded on a financial market. Moreover, the accounting treatment of items such as depreciation and goodwill may cause market value to substantially exceed book value, as the evidence suggests it did in this case. The PFS itself only provided, as instruction, the heading "Other assets - itemize" and at no point suggested that the itemization was to be done with respect to book value. The government's only evidence that Olympic expected that Tierney list TMC's book value was the loan officer's statement that "anybody in business, if [he] filled out the form, would know [to enter] the worth of the corporation, the worth as reflected in his balance sheet at that date." From this statement, the government argues that a rational jury could conclude beyond a reasonable doubt that Tierney, as a sophisticated businessman, was aware of Olympic's requirement. Given Tierney's use of market value in previous PFSs, the use of market value by other bank customers in their financial statements, and the witness' qualification of this statement during cross-examination, we doubt that a rational jury could have done so.

However, we think that the evidence in support of the government's fourth allegation is sufficient to sustain Tierney's

conviction.  Tierney does not argue that he actually held title to the property at 35 Grayfield Avenue.  Nor does he argue that it would be irrational for a jury to conclude beyond a reasonable doubt that such a misrepresentation would be made for the purpose of influencing the bank's decision.  Instead, he argues that the jury should have believed and credited his plausible explanation: that he misunderstood the legal ramifications of his contributions to the construction of the residence, and that he did not become aware that his wife was the true title-holder until after filing the PFS.  Although Tierney's explanation is certainly a reasonable one, the jury need not have given it credence if other reasonable explanations existed.  Olbres, 61 F.3d at 972-73.  We are generally bound by that credibility determination. Carroll, 105 F.3d at 743.  As the evidence showed that Tierney was a sophisticated real estate investor, a rational jury could have concluded beyond a reasonable doubt that he was aware at the time of filing the PFS that title to 35 Grayfield was not in his name.  Given the worth of the property, and the fact that other real estate assets listed on the PFS were held in trust (and thus potentially less available to creditors), a jury could also have concluded beyond a reasonable doubt that Tierney misrepresented the title-holder in order to influence Olympic in extending his line of credit.

Moreover, our conclusion as to this fourth allegation makes at least the first and second allegations more plausible.  A jury that

-11-

had concluded beyond a reasonable doubt that Tierney made one misrepresentation for the purpose of influencing a credit decision could have reasonably concluded that other misrepresentations were made for the same purpose. Cf. United States v. Bellucci, 995 F.2d 157, 160 (9th Cir. 1993) (jury could infer from deliberate deception intended to influence loan administration that false statements on the loan application were likewise deliberate and meant to influence the bank's decision). As the evidence shows that Tierney inaccurately reported his income and incorrectly stated that he was not a defendant in any lawsuits, evidence supporting a finding that he made a purposeful misrepresentation on the real estate section of the PFS supports a finding that his other misrepresentations were not inadvertent, but were made for the purpose of influencing the bank's decision.

Having found sufficient evidence to support the conviction, we **affirm**.