# United States Court of Appeals
## For the First Circuit

_____

Nos. 00-2016, 00-2017

UNITED STATES,

Appellee,

v.

RUBEN LOPEZ-LOPEZ,

Defendant, Appellant.

_____

No. 00-2018

UNITED STATES,

Appellee,

v.

CARLOS SANTANA,

Defendant, Appellant.

_____

No. 00-2020

UNITED STATES,

Appellee,

v.

RAMON LUCIANO-DEL-ROSARIO,
A/K/A RUBEN LUCIANO-DEL-ROSARIO,

A/K/A RUBEN LUCIANO-DE-LA-ROSA.

Defendant, Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

_____

Before

Boudin, Chief Judge,
Kravitch,[*] Senior Circuit Judge,
and Lynch, Circuit Judge.

_____

Alexander Zeno for appellant Ruben Lopez-Lopez.
Maria H. Sandoval for appellant Carlos Santana.
Rafael F. Castro-Lang for appellant Ramon Luciano-del-Rosario.
Timothy S. Vásquez, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, and Jorge E. Vega-Pacheco and Thomas F. Klumper, Assistant United States Attorneys, were on brief for appellee.

_____

February 19, 2002
_____

_____

[*]     Of the Eleventh Circuit, sitting by designation.

-2-

**LYNCH, Circuit Judge**. Ruben Lopez-Lopez, Ramon Luciano-del-Rosario, and Carlos Santana were convicted of importation of, and possession with intent to distribute, approximately 700 kilograms of cocaine and for aiding and abetting these crimes. They were each sentenced to 235 months, or slightly less than 20 years, in prison.

Lopez-Lopez, Luciano, and Santana challenge their convictions on numerous grounds. Summing the arguments of all three, they claim the district court erred by: (1) denying Santana's motion to dismiss based on "inadequate" legal instruction to the grand jury; (2) refusing to suppress evidence obtained from their arrests, which Lopez-Lopez alleges to have been without probable cause; (3) admitting identification evidence of Luciano, which they allege to have violated their due process rights; (4) admitting testimony that Lopez-Lopez told Luciano to remain silent when the police were questioning Luciano; (5) allowing the government's witness to provide expert testimony based on his prior experiences prosecuting drug cases; (6) ordering the prosecutor to demonstrate the use of a spotlight in the courtroom; (7) refusing to instruct the jury that it could consider prior testimony by government witnesses as substantive evidence on behalf of the appellants under Fed. R. Evid. 801(d)(1)(A); (8) refusing to instruct the jury to acquit Santana if the jury determined that Santana was just as likely to have been smuggling aliens; (9) sentencing them on the evidence presented, which they allege is insufficient; (10) sentencing

-3-

them in violation of Apprendi v. New Jersey, 530 U.S. 466 (2000); and (11) refusing to allow them access to discovery concerning their constitutional challenge to the appointment of United States Attorney Guillermo Gil.

Although this is a close case on the sufficiency of the evidence of Santana's guilt, we reject appellants' arguments and uphold their convictions and sentences. We note at the outset that we reject appellants' argument that the drug laws under which they were sentenced are unconstitutional under Apprendi.

**I.**

On the night of March 23, 1999, at approximately 3:00 a.m., the Rapid Action Force Unit ("FURA") of the Puerto Rico Police was on routine patrol at sea. Three agents were on the patrol boat: Waldy Velez, Pedro Rivera, and Hector Camacho. On their radar, the FURA agents spotted another boat, about a quarter mile out at sea, with its lights off. The FURA boat approached this other boat. When the FURA boat was approximately 25 feet from the boat on radar, the agents shined the FURA boat's two spotlights on the other boat, which both agents Velez and Rivera saw was a speed boat with three men aboard. The speed boat responded by speeding up, colliding with the FURA boat, and then heading on a zig-zag course toward shore. As the speed boat sped away, its occupants started to throw items overboard.

A few minutes later, when the speed boat neared the shore-line of Isla Matei, a small uninhabited island off the coast of mainland Puerto Rico, the speed boat's occupants abandoned ship, swam or waded to shore, and then ran onto the island. They were carrying plastic bags. Instead of pursuing the three men, the FURA agents pursued the now unmanned speed boat and gained control of it. They found 700 kilograms of cocaine in the speed boat and in the surrounding sea. The agents also found t-shirts, rain gear, wetsuits, a marine radio, a Global Positioning System ("GPS"), a satellite telephone, and a cellular telephone.

One hour later, at approximately 4:00 a.m., two police officers of the Yauco narcotics unit, Jose Alarcon and Octavio Cruz, were driving down Highway 324. They had been advised that FURA agents were pursuing a fleeing vessel with a load of drugs, and were headed toward the Phosphorescent Bay area where there might be land crews waiting to assist the drug-carrying boat.

On their way to the bay, the Yauco police officers saw three men walking along Highway 324 in a rural area at least two miles from Isla Matei, where the boat's occupants had fled. These three men turned out to be the appellants: Lopez-Lopez, Luciano, and Santana. Officers Alarcon and Cruz did not know that the drug boat had been abandoned, nor did they know that three persons had fled the boat. The three men ran into a field by the roadside and hid. There, officers Alarcon and

Cruz apprehended them. Officers Alarcon and Cruz, with the assistance of police officers from the town of Lajas, who had arrived to assist them, arrested the men and took them to the Guanica police station. At the time of their arrest, only Lopez-Lopez spoke, and he stated that he had been robbed and abandoned in the area. All three men appeared damp and exhausted. Only these three were found in the police search of the area.

At approximately 6:00 a.m., agents Velez and Rivera -- two of the FURA agents who had encountered and pursued the speed boat -- arrived at the Guanica station. Lopez-Lopez, Luciano, and Santana were being held in a central area on the first floor of the small, two-story structure. Upon seeing the three men in handcuffs, agents Velez and Rivera immediately identified Luciano as the pilot of the speed boat, but the agents did not identify Lopez-Lopez or Santana. Neither a lineup nor a photographic display was ever conducted. The agents later conducted ion and fiber tests of the three men and their clothing in order to detect the presence of cocaine or fibers from the bales recovered from the speed boat. All of the tests returned negative results.

Three weeks later, Yauco police officer Cruz, accompanied by customs agent Ismael Padilla and other agents, returned to the site of the earlier arrests. The purpose of their visit to the field was for officer Cruz to show agent Padilla where the arrests occurred, not to

gather evidence. Although no evidence was found in the field at the time the three were arrested, this time the agents found several items, including a cellular telephone and a bag containing money and two wallets. None of the wallets contained identification of the defendants. Through telephone record analysis of the telephone found in the field, it was determined that, at 3:27 a.m. on the night the speed boat was apprehended and the defendants were arrested, a call was placed from the cellular telephone to a telephone accessible to residents in the building where Lopez-Lopez lived.

Lopez-Lopez, Luciano, and Santana were indicted on two counts: (1) possession with intent to distribute, and aiding and abetting possession with intent to distribute, 700 kilograms of cocaine, 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2, and (2) importation, and aiding and abetting importation, of 700 kilograms of cocaine, 21 U.S.C. § 952(a); 18 U.S.C. § 2. After a month-long jury trial, the three defendants were convicted on both counts. At sentencing, the district court determined in separate proceedings that, given the nature of the offenses and the amount of cocaine involved, each defendant's base offense level was 38. Given a criminal history category of I, the district court found that the guidelines imprisonment range was 235 to 293 months. On July 10, 2000, the trial judge sentenced each defendant to 235 months in prison.

**II.**

## A. Grand Jury Instructions (Santana)

Santana renews his pretrial argument that the indictment should be dismissed because he says the grand jury was inadequately instructed in violation of Fed. R. Crim. P. 6 and the Due Process Clause of the Fifth Amendment. He requests that we review the grand jury minutes in order to answer several questions he raised in the district court about the grand jury instructions.[1]

We review the district court's refusal to dismiss the indictment de novo because Santana's claim is a purely legal one. United States v. Balsam, 203 F.3d 72, 81 n.8 (1st Cir. 2000) (de novo review). We affirm the district court's denial of Santana's motion to dismiss the indictment for two reasons. First, under federal law the prosecutor is not obligated to provide legal instruction to the grand jury. Second, the alleged errors in the grand jury proceedings are harmless in light of the petit jury proceedings and verdict.

"[N]either the Fifth Amendment nor any other constitutional provision prescribes the kind of evidence upon which grand juries must act." Costello v. United States, 350 U.S. 359, 362 (1956). "Courts .

---

[1] Santana requests that we determine (1) whether legal instructions were read to the grand jury; (2) if so, whether the instructions were read at the beginning of the proceedings or at the end; (3) whether the grand jurors who heard the instructions were the same ones that indicted Santana; (4) whether the grand jury received instructions on the meaning of "probable cause"; and (5) whether the grand jury was advised of certain facts alleged to be material. We decline to pursue Santana's suggested inquiries.

. . generally have found that the prosecutor satisfactorily explains the offense to be charged by simply reading the statute to the grand jury."[2] 4 Criminal Procedure § 15.7(g), at 450 (LaFave et al., eds., 2d ed. 1999). "The prosecutor is under no obligation to give the grand jury legal instructions." United States v. Zangger, 848 F.2d 923, 925 (8th Cir. 1988); accord United States v. Kenny, 645 F.2d 1323, 1347 (9th Cir. 1981). Santana's motion to dismiss the indictment was properly denied.

In addition, Santana was subsequently and properly convicted by a petit jury and so the alleged errors in the grand jury proceeding are harmless. United States v. Mechanik, 475 U.S. 66 (1986) (upholding convictions, despite violation of Fed. R. Crim. P. 6(d)); United States v. Flores-Rivera, 56 F.3d 319, 328 (1st Cir. 1995). "[T]he petit jury's verdict of guilty beyond a reasonable doubt demonstrates a fortiori that there was probable cause to charge the defendants with the offenses for which they were convicted." Mechanik, 475 U.S. at 67.

---

[2] Santana relies on New York state case law to the contrary, but this state case law is inapposite. People v. Calbud, Inc., 402 N.E.2d 1140 (N.Y. 1980), like the other cases on which Santana relies for the proposition that prosecutors must provide legal instructions to grand juries, interprets New York law requiring prosecutors to provide legal guidance to the grand jury, see N.Y. Crim. Proc. Law § 190.25 subd. 6 (Consol. 2001). This state law requirement does not bear on our interpretation of what federal law requires.

**B. Unlawful Arrest (Lopez-Lopez)**

Lopez-Lopez argues that the district court erred by refusing to suppress all evidence obtained from his arrest, as well as the arrests of Luciano and Santana,[3] all of which he alleges were without probable cause. Lopez-Lopez concedes that he did not raise the unlawful arrest argument in the district court and that it is therefore forfeited. Nonetheless, he argues that under United States v. Olano, 507 U.S. 725, 731-32 (1993), there was a plain error affecting substantial rights and, accordingly, this court should provide relief. We treat his argument as waived under Rule 12(f) rather than as forfeited.

Fed. R. Crim. P. 12(b) requires that motions to suppress be raised prior to trial. Rule 12(f) provides that a "[f]ailure by a party" to so move "shall constitute waiver." A court may "grant relief from the waiver" if a party shows cause.[4] Fed. R. Crim. P. 12(f). Lopez-Lopez did not move to suppress the fruits of the allegedly unlawful arrests prior to trial and so his argument is waived under Rule 12(f). United States v. Bashorun, 225 F.3d 9, 13 (1st Cir. 2000);

---

[3]  Because Fourth Amendment rights are personal to each defendant, Lopez-Lopez may not vicariously assert the Fourth Amendment rights of his codefendants. United States v. Padilla, 508 U.S. 77, 81-82 (1993) (per curiam). We treat Lopez-Lopez's argument as an objection to the evidence obtained from his own arrest.

[4]  The question whether an appellate court may review for plain error despite a Rule 12(f) waiver, provided that the record enables review, is open in this circuit. See United States v. Bashorun, 225 F.3d 9, 16 (1st Cir. 2000).

United States v. Torres, 162 F.3d 6, 10-11 (1st Cir. 1998). Lopez-Lopez has not even attempted to offer an explanation for his failure to move to suppress. He has not shown cause for relief and so his argument is waived. Fed. R. Crim. P. 12(f).

The plain error review that Lopez-Lopez requests would be inconsistent with, and would allow Lopez-Lopez to escape from, his noncompliance with Rule 12. The argument has been waived and he has shown no cause for relief. The district court record is insufficiently developed, due to Lopez-Lopez's own failure to raise the issue, to permit reliable appellate review. United States v. Nuñez, 19 F.3d 719, 722, 723 n.10 (1st Cir. 1994); see also Torres, 162 F.3d at 11 n.2 (plain error review doctrine inapplicable where defendant has failed to develop factual record related to his suppression argument). That ends the matter.

## C. Identification of Luciano (Lopez-Lopez, Luciano, Santana)

Lopez-Lopez, Luciano, and Santana challenge the district court's denial of Luciano's motion to suppress agent Velez's and agent Rivera's pretrial identification of Luciano. All three object only to the identification of Luciano, as agents Velez and Rivera never identified Lopez-Lopez or Santana. Appellants argue that the show-up of Luciano to agents Velez and Rivera created a substantial likelihood of misidentification in violation of the Due Process Clause.[5]

_____

[5]    In the district court, neither Lopez-Lopez nor Santana moved

-12-

Specifically, Luciano appeals the district court's refusal to suppress evidence that at the Guanica station, about two and one-half hours after pursuing the speed boat at sea and observing the boat's driver, agents Velez and Rivera identified Luciano as the driver.

The findings of the district court after a hearing on a pretrial motion to suppress are binding on this court unless they are clearly erroneous. United States v. De Jesus-Rios, 990 F.2d 672, 677 (1st Cir. 1993). These findings determine the outcome here.

Pretrial identification evidence is subject to constitutional limitations under the Due Process Clause. Stovall v. Denno, 388 U.S. 293, 298-99 (1967); United States v. Watson, 76 F.3d 4, 6 (1st Cir. 1996) (citing Manson v. Brathwaite, 432 U.S. 98 (1977)). We employ a two-pronged analysis to determine whether evidence of a pretrial identification should be suppressed. Watson, 76 F.3d at 6. "First, the court must determine whether the procedure was impermissibly suggestive." Id. If so, then the court "must decide whether the identification itself was reliable under the totality of the circumstances, notwithstanding the suggestive procedure." Id. The

_____

to suppress the identification of Luciano and so whatever arguments they might have are waived. See Fed. R. Crim. P. 12(f). We consider Luciano's argument on appeal, which he previously raised in the November 19, 1999 suppression hearing. Little turns on this waiver, however, because the district court properly admitted the identification evidence.

likelihood of misidentification must be very strong in order to suppress the evidence.  Id.; De Jesus-Rios, 990 F.2d at 677.

There is little basis to overturn the district court's conclusion that the procedure was not impermissibly suggestive.  This conclusion eliminates Luciano's due process argument.  Watson, 76 F.3d at 6.  The facts, as found by the district court, were that, after a long night, agents Velez and Rivera returned to the Guanica station unaware that specific people had been arrested.  On entering the station, the officers did not anticipate seeing detainees suspected of operating the speed boat, but the officers saw the three detainees, who were being held downstairs because of the station's small size and upstairs offices.  Both officers immediately, spontaneously, and without being prompted, identified Luciano as the speed boat's pilot.  These facts do not make for an impermissibly suggestive show-up.

Luciano attempts to undermine the spontaneity of the identification by pointing to three separate stories told about the identification.  Cf. Jackson v. Fogg, 589 F.2d 108 (2d Cir. 1978) (affirming district court's grant of habeas where conviction was based solely on questionable identification procedures).  But the district court rejected Luciano's alternative view of the facts and found "no evidence whatsoever that the identification happened in any other form than the spontaneous form in which the agents testified."  We cannot say that this conclusion was unreasonable.

-14-

Luciano also attempts to undercut the spontaneity of the identification by arguing that the police could easily have used less suggestive identification procedures and that there was no good reason for allowing the detainees to sit on the first floor of the Guanica station where agents Velez and Rivera might easily see them. But the first part of this argument assumes that an identification was intentionally contemplated by the Guanica police. The district court found that at the time the identification occurred, the officers in the Guanica station were not attempting to undertake an identification; the detainees were simply sitting downstairs. The government concedes that it did not attempt less suggestive identification procedures, such as a lineup. But, as the district court concluded, "there was no need for a lineup" after the officers immediately identified Luciano. The second part of Luciano's argument is that the police should not have detained the suspects downstairs, where anyone walking in could see them. No doubt the Guanica police might have been more careful. But the detainees were downstairs because the Guanica station is a small, two-story building and it was not unreasonable to opt against holding the suspects upstairs where the administrative offices are located. These circumstances do not support Luciano's theory that this was all a setup.

-15-

**D. Lopez-Lopez's Post-Arrest Statement (Lopez-Lopez, Luciano)**

Lopez-Lopez and Luciano allege that the district court committed reversible error at trial when it denied their objection to suppress evidence of a statement Lopez-Lopez made at the Guanica station.  Lopez-Lopez told Luciano "don't answer"[6] when Luciano was asked whether he knew anything about a shipment that had been seized.  The district court permitted officer Juan Arevalo-Echevarria, a sergeant in the Yauco drugs division, to testify that Lopez-Lopez had told Luciano to remain silent.  Both Lopez-Lopez and Luciano now argue that officer Arevalo's testimony constituted improper comment on their rights to remain silent, in violation of their Fifth Amendment rights.  Luciano also argues that the testimony violated the rule of Bruton v. United States, 391 U.S. 123 (1968), which prohibits admission of testimony by a nontestifying defendant inculpating a codefendant in a joint trial.[7]

As to the first claim, that the admission of Lopez-Lopez's statement telling Luciano not to answer violated both defendants' Fifth Amendment rights, we first note the general prohibition established in Doyle v. Ohio, 426 U.S. 610 (1976).  Subject to certain exceptions, admission of evidence of a defendant's post-arrest silence, after

_____

[6]     Lopez-Lopez went on to say "we don't know anything about the shipment," but that statement was not introduced at trial.

[7]     Lopez-Lopez, in one sentence of his brief, attempts to adopt Luciano's Bruton argument.  But Bruton is unavailable to Lopez-Lopez because Lopez-Lopez is the declarant and the statement is therefore admissible against him.

-17-

<u>Miranda</u> warnings have been provided, to impeach an explanation a defendant offers at trial, violates a defendant's Due Process rights. <u>Id.</u> at 618-19. Lopez-Lopez and Luciano say that Lopez-Lopez's statement to Luciano fits the pattern governed by <u>Doyle</u>. Lopez-Lopez and Luciano characterize Lopez-Lopez's direction to Luciano, telling him "don't answer," as reminding Luciano of his legal right, under <u>Miranda</u>, to remain silent. They argue that Lopez-Lopez's reminder to Luciano of Luciano's right, and Luciano's exercise of his right to remain silent upon being reminded, are being used against both of them.

The <u>Doyle</u> argument fails because their post-<u>Miranda</u> silence was not used against them at trial. Officer Arevalo testified about what Lopez-Lopez said, not as to the silence of either defendant. There was no testimony as to whether Luciano responded to Lopez-Lopez's suggestion by remaining silent and there was no testimony about either party remaining silent in the face of questioning. That what Lopez-Lopez said involved a statement about not saying anything does not put the statement into the category of post-<u>Miranda</u> silence upon which comment is impermissible. When an accused is given his <u>Miranda</u> rights, and then waives those rights by voluntarily making statements, he may not rely on <u>Doyle</u> to object to the admission of those statements simply because the statements refer to the act of keeping silent. <u>Cf.</u> <u>United States</u> v. <u>Harris</u>, 956 F.2d 177, 181 (8th Cir. 1992) (holding that it is

-18-

permissible to admit testimony that the accused ceased to answer questions once the accused initially begins answering questions).

The Bruton argument also fails. The argument goes like this. When, in a joint trial, a statement is admitted of a defendant confessing to a crime and implicating a codefendant, the codefendant may be deprived of his Confrontation Clause rights by being unable to force the confessing defendant to take the stand and be cross-examined (due to the confessing defendant's Fifth Amendment rights). Bruton, 391 U.S. at 137. In such situations, a limiting instruction that the jury should consider the statement only as to the confessing defendant may be inadequate to protect the implicated codefendant. Id. The theory here is that Lopez-Lopez's statement telling Luciano not to answer tends to incriminate them both and is sufficiently like a confession to warrant Bruton protection. We agree that it tends to be incriminating, but that does not answer the question of whether it is within Bruton's scope.

The challenged testimony here does not fall within Bruton, as that rule has developed. The statement "don't answer" is not a confession. As we recently noted in Brown v. Maloney, 267 F.3d 36 (1st Cir. 2001), Bruton does not necessarily apply, if indeed it ever applies, when such statements are involved. Id. at 41-42. We need not resolve this ambiguity because Lopez-Lopez's statement is not sufficiently close to a confession: that is, it is not powerfully

-19-

incriminating. See United States v. Smith, 46 F.3d 1223, 1227-28 (1st Cir. 1995) (noting Bruton's requirement of "express[ ]" and "powerful[ ]" implication); Richardson v. Marsh, 481 U.S. 200, 208 (1987) (holding that Bruton applies when a nontestifying defendant's statement "expressly implicat[es]" a codefendant, leaving no doubt that it would be "powerfully incriminating")(quoting Bruton, 391 U.S. at 124 n.1, 135). The argument that the statement was of an "incriminatory nature" is insufficient to clear the hurdle requiring a powerfully incriminating statement. Cf. Brown, 267 F.3d at 42 (holding that it was reasonable for a state court to conclude that Bruton did not apply in the absence of powerfully incriminating evidence). Lopez-Lopez's "don't answer" statement did not even mention any person or any crime or any criminal responsibility.

In addition, Luciano asked for neither a severance nor a limiting instruction. Of course, in a true Bruton confession situation, a limiting instruction would not cure the harm. 391 U.S. at 135-37. But Luciano's failure to even ask for a limiting instruction is a fair gauge for measuring the lack of harm to Luciano from the evidence.

**E. Expert Testimony (Lopez-Lopez, Luciano, Santana)**

All three appellants renew their objections to the district court's decision to allow one of the government's witnesses, U.S. Customs Service agent Jiménez, to provide expert testimony based on his

prior experiences investigating drug importation operations. The parties agree that agent Jiménez was not in any way involved in the investigation of this case. The government characterizes the testimony as "expert" or "quasi-expert" and says that it offered it to explain to the jury the modus operandi of individuals importing drugs into Puerto Rico and the tools of that unlawful trade. Agent Jiménez testified about how drug importation schemes use GPS to facilitate air drops and boat-to-boat transfers, and about how cellular telephones are used to enable boat-to-ground communication. The evidence was relevant because a GPS and a cellular telephone were found on the speed boat in this case and a cellular telephone was later found in the field where the three were arrested.

Appellants attack on several fronts. They say that, under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), the district court failed to apply the correct standard for admitting expert testimony. They also characterize the drug importation scheme as "plain vanilla" and argue that expert testimony was unnecessary to help the jurors understand a type of criminal operation with which the jurors are "familiar." Furthermore, they argue that agent Jiménez was incompetent to testify. Fed. R. Evid. 601. Finally, they argue that under Fed. R. Evid. 403 the evidence's "probative value [was] substantially outweighed by the danger of unfair prejudice" and so the district court

-21-

should have excluded the evidence. We review for abuse of discretion the district court's decision to admit this expert testimony. United States v. Sebaggala, 256 F.3d 59, 66 (1st Cir. 2001).

As to the wrong standard argument, Daubert, as amplified in Kumho Tire, simply requires that the trial judge, under the Federal Rules of Evidence, ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597, quoted in Kumho Tire, 526 U.S. at 141; see also Fed. R. Evid. 702 & advisory committee's note (amended in response to Daubert and Kumho Tire). As Daubert stated, and Kumho Tire reaffirmed, the test for reliability is "flexible" and "Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case." Kumho Tire, 526 U.S. at 141-42; see also Fed. R. Evid. 702 advisory committee's note (stating that the Daubert factors are not "exclusive [or] dispositive"). Furthermore, "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." Kumho Tire, 526 U.S. at 142.

Both defense counsel and the district court were apprised of the government's proposal to introduce agent Jiménez's expert testimony. There is no reason to believe that the district court somehow failed to perform its gatekeeping function: outside of the presence of the jury, the district court heard defense counsel's

objections to the expert testimony and the government's proffer. The court found that agent Jiménez's testimony was based on his experience with how GPS and cellular telephones are used in drug operations. That the court acted as gatekeeper is evident from its decision to sharply constrain agent Jiménez's testimony. The court permitted him to testify where it believed his testimony was relevant and helpful, for example, to explain the meaning of GPS coordinates found on the boat and to explain the range of cellular telephones at sea, but refused to allow him to testify where it thought the evidence was not relevant or helpful, for example, to explain the presence of raincoats and wetsuits on the boat.

Next is the claim that the expert testimony was improper because it related to subjects that the jurors could understand without such testimony. A district court may admit expert testimony if it finds that "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The district court has "considerable latitude" in deciding whether expert testimony will be helpful to the jury. Sebaggala, 256 F.3d at 65. We are mindful that "[t]he trial judge has a hands-on familiarity with the nuances of the case -- nuances which may not survive transplantation into a cold appellate record." United States v. Hoffman, 832 F.2d 1299, 1310 (1st Cir. 1987).

Here, the trial judge determined that agent Jiménez's testimony would help the jury understand the role of a GPS and cellular telephones in marine drug importation schemes. Appellants have made no reasoned argument to support the claim that GPS, GPS coordinates, their level of accuracy, nautical charts, marine navigation, and the role of all of these things in drug smuggling operations are common knowledge. Nor is there any evidence that cellular telephones, their ranges at sea, and their role in smuggling operations are within the typical juror's common knowledge. It is well established that, in drug cases, the government may call expert witnesses to testify about criminal modus operandi when such testimony would be helpful to the jury. "We have admitted expert testimony regarding the operation of criminal schemes and activities in a variety of contexts, finding such testimony helpful to juries in understanding some obscure or complex aspect of the crime." United States v. Montas, 41 F.3d 775, 783 (1st Cir. 1994); see also United States v. Hensel, 699 F.2d 18, 38 (1st Cir. 1983) (upholding admission of testimony about drug smugglers' methods because "smuggling tons of marijuana is a complex matter" and thus expert testimony would help the jury); accord United States v. Brown, 776 F.2d 397, 400 (2d Cir. 1985).

Appellants also argue that agent Jiménez was incompetent to testify under Fed. R. Evid. 601. They argue that the government, under the guise of presenting expert testimony, presented prohibited lay

opinion testimony regarding a matter of which agent Jiménez had no personal knowledge. Again, we disagree. The district court cabined agent Jiménez's testimony, as already described. Agent Jiménez is a Customs Service agent. He was a marine enforcement officer charged with interdicting suspected vessels entering Puerto Rican waters. He spent fourteen years as an electronic technician with the Air Force and he is an FCC-licensed radio operator. He has a degree in electrical engineering and has unique knowledge -- about GPS, cellular telephones, and the logistics of marine drug importation -- gained through infiltrating organizations attempting to smuggle large quantities of cocaine into Puerto Rico. These factors persuade us that the district court was well within its discretion when it found agent Jiménez competent to testify as an expert.

Appellants' best and final argument is that, under Fed. R. Evid. 403, the evidence's "probative value [was] substantially outweighed by the danger of unfair prejudice." "Even if admissible under Rule 702, expert testimony still may be excluded under Fed. R. Evid. 403 if its probative value is substantially outweighed by the risk of unfair prejudice it creates." Montas, 41 F.3d at 783. If a cellular telephone had not been found in the field as well as on the boat, appellants would have a better argument. The question at trial was not whether there was a drug conspiracy (to which the GPS and cellular telephone on the boat went), but rather whether these

defendants were the drug conspirators. The cellular telephone in the field went to the identity question of whether these defendants were the ones associated with the drug boat. In this context, the district court did not abuse its discretion in concluding that the probative value of the evidence outweighed any prejudice.

**F. Demonstrative Spotlight Evidence (Lopez-Lopez, Luciano)**

Both Lopez-Lopez and Luciano object to the district court's sua sponte order requesting the prosecution to demonstrate the use of a spotlight -- one of two different spotlights used on the FURA boat on the night of the arrests -- in the courtroom. They say the demonstrative evidence was misleading and lacking in probative value. See Fed. R. Evid. 403. It has long been settled that this determination is within the district court's sound discretion. United States v. Cartano, 420 F.2d 362, 364-65 (1st Cir. 1970); see also 4 Weinstein's Federal Evidence § 611.02[2][a][iv] (J.M. McLaughlin ed., 2d ed. 2001) (noting the court's "broad discretion" in admitting demonstrative evidence). Here, we do not think the district court abused its discretion.

Defendants put into dispute the extent to which the spotlight would have permitted the officers to view Luciano under conditions resembling daylight, as the officers alleged and the defense denied. Agent Rivera demonstrated the spotlight by turning it on in court under controlled conditions. The light was turned on for a period

approximating the two to three second period during which agents Velez and Rivera testified they witnessed Luciano on the night the speed boat was apprehended.  Furthermore, the light was flashed only in the corner of the courtroom, not on any of the appellants.

This demonstration was highly relevant.  It went to the credibility of critical testimony in the case: the testimony of agents Velez and Rivera, who claimed to have seen Luciano piloting the speed boat.  There was no error.

## G. Failure to Provide Jury Instruction on Prior Inconsistent Testimony (Lopez-Lopez, Luciano)

Lopez-Lopez and Luciano argue that the district court erred by refusing to instruct the jury that it could consider prior testimony by two government witnesses as substantive evidence on behalf of the appellants under Fed. R. Evid. 801(d)(1)(A).[8] Lopez-Lopez's argument is forfeited, as he did not assert it at trial, but we consider the objection as to Luciano and conclude that it is without merit.

Luciano argues that the court should have instructed the jury that agent Velez's prior sworn testimony, concerning the length of his observation of the driver of the speed boat at sea, could be considered as substantive evidence under Rule 801(d)(1)(A) rather than

---

[8]     Fed. R. Evid. 801(d)(1)(A) provides: "A statement is not hearsay if . . . [t]he declarant testifies at the trial . . . and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding . . . ."

merely as impeachment evidence. Second, he argues that agent Padilla's allegedly prior inconsistent testimony, concerning the circumstances under which agents Velez and Rivera later encountered Luciano at the Guanica station, should have been admitted as substantive evidence under that same rule. We review such challenges to jury instructions for abuse of discretion. United States v. Smith, 145 F.3d 458, 460 (1st Cir. 1998). We address Luciano's arguments on their terms, but note that, even if everything he has argued is true, it remains unclear that he is entitled to an instruction telling the jury to consider evidence that it has heard. Juries are presumed to consider the evidence before them and, for this reason, courts do not frequently accompany particular fragments of the evidence before the jury with special instructions that the evidence may be considered as substantive.

## 1. The Velez testimony.

At the November 19, 1999, suppression hearing, agent Velez testified that the time period during which he was able to observe Luciano at sea -- that is, the elapsed time from when agent Velez turned on the spotlight to when the drug-importing speed boat rammed into the FURA vessel -- was "maybe two or three seconds." He said, more generally, that it was "very fast." Defense counsel argues that this statement is inconsistent with Velez's testimony at trial that the same time period was "[b]etween five and four seconds" and that it

"wasn't more than five seconds." After counsel moved to admit the allegedly inconsistent prior statement as "substantive evidence" under Fed. R. Evid. 801(d)(1)(A) and the court deferred its determination of the motion, counsel said to Velez: "Two or three seconds is what it took; isn't that so?" Agent Velez responded by saying "approximately," noting that he did not have a watch in his hand at the time of the incident, and then conceding that it could have been two or three seconds, as he had said at the suppression hearing. He reiterated that it all "happened very quickly." The cross-examination then continued on the presumption that two to three seconds was the correct time estimate.

Ultimately, the court refused to instruct the jury that prior inconsistent statements could be used not just to impeach, but as substantive evidence. The court told defense counsel "I will allow you to argue anything you want on" the effect of the evidence and explained that defense counsel could develop any arguments he pleased on the basis of the discrepancy between the statements.[9] Counsel objected.

---

[9] Indeed, defense counsel took this opportunity and read and cited the transcripts from the previous hearings verbatim. At closing argument, defense counsel referred to these statements. For example, with respect to agent Padilla's testimony, defense counsel introduced verbatim the only statement that they now claim was not properly admitted; that is, agent Padilla's statement that the identification of Luciano by agents Velez and Rivera occurred as Luciano was being brought to them. And counsel was permitted to discuss, as substantive fact, all three versions of the identification, and to invite the jury to believe any one of them, or none of them.

As to Velez's statement, we think Luciano's argument fails for a very simple reason. Agent Velez, at trial, adopted his allegedly inconsistent suppression hearing testimony when he affirmatively stated that the correct time could have been two or three seconds rather than five seconds. On these facts, there is no Rule 801(d)(1) issue, nor is there any hearsay issue at all, and thus there are no grounds for counsel to object to the district court's refusal to provide an 801(d)(1) instruction. See Fed. R. Evid. 801(d)(1) advisory committee's note ("If the witness admits on the stand that he made the statement and that it was true, he adopts the statement and there is no hearsay problem."); United States v. Klein, 488 F.2d 481, 483 (2d Cir. 1973); 5 Weinstein's Federal Evidence, supra, at § 801.21[4] ("If a witness, questioned about a prior statement, admits on the stand that he or she made the statement and acknowledges that it is true, the witness thereby adopts the prior statement as his or her testimony. This adoption bypasses the requirements of Rule 801(d)(1) and the entire hearsay problem.").

**2. The Padilla testimony.**

At a March 25, 1999, preliminary hearing, agent Padilla testified that when he interviewed agents Velez and Rivera, they said that they identified Luciano as the speed boat's driver as he was being brought to them at the station. At trial, agent Padilla testified that agents Velez and Rivera told him that they could identify Luciano as

the boat's captain.  Defense counsel presented agent Padilla with his preliminary hearing transcript statement to refresh his recollection of his earlier testimony.  Agent Padilla admitted to making the statement in the transcript.

On these facts, Luciano's argument again fails.  First, the preliminary hearing statement and the trial statement are not at all inconsistent, and thus Rule 801(d)(1)(A) does not apply.  Second, defense counsel did not attempt to introduce agent Padilla's testimony as substantive evidence; it was admitted, at counsel's direction, to refresh agent Padilla's recollection.  Luciano may not now argue, for the first time on appeal, that it was error not to admit the evidence for some other purpose.[10]

## H. Failure to Provide Jury Instruction on the Alien Smuggling Theory (Santana)

Santana alone claims it was reversible error for the district court to refuse to instruct the jury to acquit if the jury determined that Santana was just as likely smuggling aliens as importing cocaine.

---

[10]    Luciano also argues that agent Padilla's preliminary hearing testimony conflicts with the testimony of agents Velez and Rivera. Agents Velez and Rivera testified to having observed Luciano while he was seated in the station, not while he was being brought to them. Luciano advances this portion of the argument in one sentence in his brief, but we can dispense with it almost as quickly.  Rule 801(d)(1)(A) by its terms applies when a declarant testifies at trial and that testimony is inconsistent with the declarant's own testimony under oath at a prior proceeding.  The rule does not apply where, as here, the declarant's prior statement is inconsistent with the in-court testimony of some other witness.

We give plenary review to the question of whether the evidence adequately supported the requested instruction. United Stated v. Rodriguez, 858 F.2d 809, 812 (1st Cir. 1988).

At the jury instructions conference, Santana's counsel requested a jury instruction stating "if it's equally probable that defendants could have been involved in some alien smuggling venture, then you must acquit." The district court refused to provide the instruction because of insufficient evidence in the record to support the alien smuggling theory. The court noted that there was no evidence to connect Santana to any smuggling ring. Counsel responded by stating that "aliens routinely hide for long periods of time before they start moving" and implied that such hiding occurs in the areas where Santana was arrested, but conceded that the evidence for these claims was "not . . . in this record."

On the facts, the district court was well within its discretion in finding that the evidence in the record was insufficient to support a claim that it was equally plausible that Santana was involved in an alien smuggling operation. Although a defendant has a right to have the jury instructed on his theory of the defense, this right extends only to those defenses for which there is sufficient evidentiary support. Mathews v. United States, 485 U.S. 58, 63, 66 (1988); United States v. McGill, 953 F.2d 10, 12 (1st Cir. 1992); United States v. Passos-Paternina, 918 F.2d 979, 984 (1st Cir. 1990).

-32-

The defendant is not entitled to an instruction on a defense when the evidence in the record does not support that defense.  See generally 2A C.A. Wright, Federal Practice and Procedure § 482, at 346-50 & n.20 (3d ed. 2000).

Here, although the location where Santana was apprehended may well have been one where illegal aliens sometimes entered Puerto Rico, there was no evidence in the record connecting Santana to any alien smuggling operation.  Even considering the evidence in the light most favorable to Santana, there was insufficient evidence to conclude that he might have been part of an alien smuggling operation, and thus insufficient evidence to warrant his proposed instruction. Furthermore, the district court permitted the defense to present its alien smuggling theory at closing, so long as the defense presented it in a way that did not distort the evidence, thereby further undermining Santana's claim here.

## I. Sufficiency of the Evidence (Lopez-Lopez, Luciano, Santana)

Lopez-Lopez, Luciano,[11] and Santana argue that the evidence on which they were convicted is insufficient and that their convictions should therefore be vacated.  See Fed. R. Crim. P. 29(a) ("The court .

---

[11]    Luciano's argument is unclear because he argues that he should have been acquitted under Fed. R. Crim. P. 29 only in the context of his claim that the district court should have suppressed agent Velez's identification testimony.  We give Luciano the benefit of the doubt but nonetheless conclude that the evidence on which he was convicted was sufficient.

-33-

. . shall order the entry of judgment of acquittal . . . if the evidence is insufficient to sustain a conviction . . . ."). As we stated in United States v. Sullivan:

> In assessing a challenge to the sufficiency of the evidence, we "review the record to determine whether the evidence and reasonable inferences therefrom, taken as a whole and in the light most favorable to the prosecution, would allow a rational jury to determine beyond a reasonable doubt that the defendants were guilty as charged."

85 F.3d 743, 747 (1st Cir. 1996) (quoting United States v. Mena-Robles, 4 F.3d 1026, 1031 (1st Cir. 1993)); see also United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992).

The indictment charged each of the three defendants with (1) possession with intent to distribute, and aiding and abetting possession with intent to distribute, 700 kilograms of cocaine, 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2, and (2) importation, and aiding and abetting importation, of 700 kilograms of cocaine, 21 U.S.C. § 952(a); 18 U.S.C. § 2. All three defendants were convicted on both counts of the indictment. Thus, on count one, the government had the burden of proving, with respect to each defendant, the essential elements of the crime of possession of cocaine with intent to distribute. Specifically, the government had to prove "that the defendant[s] possessed cocaine, either actually or constructively, that [they] did so with a specific intent to distribute the cocaine over which [they] had actual or constructive possession, and that [they] did so knowingly and intentionally." United States v. Latham, 874 F.2d 852, 863 (1st

-34-

Cir. 1989). On count two, the government had to prove that the defendants brought cocaine into the country from international waters or from airspace in excess of twelve miles outward from the coastline. United States v. Nueva, 979 F.2d 880, 884 (1st Cir. 1992). "[N]o premium is placed on direct as opposed to circumstantial evidence." Ortiz, 966 F.2d at 711.[12]

On appeal, our role is to determine whether the jury's verdict is supported by a plausible rendition of the evidence, not to weigh the evidence or make credibility judgments that are properly within the purview of the jury. United States v. Tierney, 266 F.3d 37, 40 (1st Cir. 2001). Although this case is a close one with respect to Santana, we conclude that the evidence, taken as a whole and in the light most favorable to the prosecution, would permit a rational jury to determine beyond a reasonable doubt that the defendants were guilty as charged.

---

[12] Appellants all deny that they were the speed boat's occupants. No one disputes that the intercepted boat had cocaine on board, or that the boat's occupants were all in possession of the cocaine, or that the quantity on board was sufficient to give rise to an inference that the boat's occupants intended to distribute the cocaine, see Latham, 874 F.2d at 862 (noting "the doctrine that possession of large quantities of drugs justifies the inference that the drugs are for distribution and not personal use" and citing several cases applying this inference), or that the boat imported the cocaine into the country from international waters, or that all of this was done knowingly and intentionally. The only question was whether Lopez-Lopez, Luciano, and Santana were the boat's occupants.

A brief description of the evidence on which appellants were convicted is helpful. At trial, the evidence established that three FURA agents encountered at sea a boat occupied by three people and about 700 kilograms of cocaine. The FURA agents successfully captured the boat and the cocaine, but the boat's three occupants escaped to a nearby beach at about 3:00 a.m. Fortunately, agents Velez and Rivera were able to get a look at the boat's captain. One hour later, at 4:00 a.m., Yauco police officers Alarcon and Cruz, responding to the drug boat capture, saw three men walking along a rural highway at least two miles from where the boat's occupants had last been seen. These three men turned out to be the appellants: Lopez-Lopez, Luciano, and Santana. The three men ran and hid in a field by the roadside. There, officers Alarcon and Cruz, together with additional officers from the town of Lajas, apprehended and arrested them. At the time, all three men appeared damp and exhausted.

At approximately 6:00 a.m., agents Velez and Rivera arrived at the station where Lopez-Lopez, Luciano, and Santana were being held. Upon seeing the three individuals in handcuffs, agents Velez and Rivera immediately identified Luciano as the pilot on the boat they had seen only a few hours earlier, but neither agent was able to identify Santana or Lopez-Lopez because neither agent had seen the faces of the other two men on the boat while at sea.

Three weeks later, officer Cruz, accompanied by customs agent Padilla and others, returned to the field where officers Alarcon and Cruz had found and arrested Lopez-Lopez, Luciano, and Santana. The agents found several items, including a cellular telephone. Through telephone record analysis of the telephone found in the field, it was determined that at 3:27 a.m., on the night the speed boat was apprehended and the three were arrested, a call was placed from the cellular telephone to a telephone accessible to residents in the building where Lopez-Lopez resided. Between March 1, 1999, and March 23, 1999, several other calls had been placed from the cellular telephone to this building.

On this evidence, a rational jury could have determined beyond a reasonable doubt that Luciano was guilty on both counts. Agents Velez and Rivera testified that they saw Luciano piloting the boat full of cocaine. If the jury credited this testimony, then the government made out a case against Luciano. So the question, for Luciano, is simply whether a reasonable jury could have credited this testimony.

Luciano says that agents Velez and Rivera observed the boat's driver for only two to three noncontinuous seconds, at a distance of fifty to sixty feet, in poor light conditions, without ever having seen the driver before, while the boat was zig-zagging. A reasonable jury could have found that the conditions were not nearly as unfavorable as

Luciano argues.  Other evidence showed that the identification was aided by an 800,000 candlepower spotlight, which is sufficient to render a dark night as bright as day.  The identification was from a distance of only about twenty feet and became even closer as the speed boat approached, and ultimately collided with, the FURA boat.  And agents Velez and Rivera were trained to focus their attention on the pilot in this type of encounter.  A reasonable jury could have concluded that this was enough to make a reliable identification of the captain.

In addition to this direct identification, there was circumstantial evidence tending to inculpate Luciano, including evidence that there were three men on the boat and that he was one in a group of three men found just miles from the boat shortly after the boat's occupants fled.

As to Lopez-Lopez, the evidence was also sufficient.  The evidence showed that Lopez-Lopez was found, with two others, walking on a rural road, in the middle of the night, within miles of where a group of three men had fled a boat loaded with cocaine. Lopez-Lopez was found with Luciano, who was identified as the boat's driver.  In addition, Lopez-Lopez was linked to the crime through telephone record analysis of the telephone found in the field. Further, Lopez-Lopez gave an improbable account of how he ended up in the field and attempted to silence Luciano when the police asked Luciano questions.

This brings us to Santana. Santana's case is much closer; although his case is on the margin, the evidence was sufficient to convict. The evidence linking Santana to the crime is hardly abundant. Three men escaped from the scene of the crime and Santana was found, with two other men, about an hour later and not too far from where the boat's occupants were last seen. He ran when he saw the police and hid in a field, which suggests awareness of guilt. Santana was damp and exhausted, consistent with his having fled the boat and run to where he was ultimately caught. "[T]hat [a defendant's] acts appeared not to be illegal when viewed in isolation does not bar his conviction." Ortiz, 966 F.2d at 714 (quoting United States v. LaChance, 817 F.2d 1491, 1494 (11th Cir. 1987) (second alteration in Ortiz)) (internal quotation marks omitted). "[J]uries are not required to examine the evidence in isolation, for 'individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts.'" Id. at 711 (quoting Bourjaily v. United States, 483 U.S. 171, 179-80 (1987)).

Santana was not only found walking by the side of the road, in the middle of the night, close in place and time to the crime. He was also found with two other men, which matches the number of men seen on the boat. And he was not only found with two other men; he was found with Luciano, who was identified by two FURA eye witness as

-39-

having been the boat's pilot, and with Lopez-Lopez, who was linked to the crime through telephone records. This is not a case in which the jury impermissibly convicted a defendant on the basis of innocent association with those involved in illegal activities. Instead, the jury reasonably concluded that Santana, by his own conduct and by his presence in the company of Lopez-Lopez and Luciano, hiding in a field in rural Puerto Rico at 4:00 a.m., having just run from the police, was anything but innocent. We think this evidence was sufficient.

**J. Apprendi (Lopez-Lopez, Luciano, Santana)**

Lopez-Lopez, Luciano,[13] and Santana advance two Apprendi arguments: (1) that their sentences are unconstitutional because they are based on factors found by the district judge under a preponderance of the evidence standard rather than on findings made by the jury beyond a reasonable doubt, and (2) that 21 U.S.C. §§ 841 and 952[14] -- the drug laws under which they were sentenced -- are unconstitutional because the laws provide for sentence computations based on factors found by the judge rather than by the jury. See Apprendi, 530 U.S. 466. We reject both claims.

---

[13]    On August 6, 2001, we granted Luciano's motion seeking leave to join Santana's Apprendi arguments.

[14]    It is unclear whether appellants challenge § 841 only, or both §§ 841 and 952. We give them the benefit of the doubt by assuming that they challenge both.

-40-

Ordinarily we would review appellants' objections only for plain error because they failed to make their arguments to the district court.  Olano, 507 U.S. at 731-32; United States v. Robinson, 241 F.3d 115, 119 (1st Cir. 2001).  Appellants argue, however, that they could not have presented their arguments at sentencing because Apprendi was decided on June 26, 2000, only two weeks before the July 10 sentencing hearing.  Although we reject this as an excuse, we will reach the merits of defendants' arguments, which we answer easily.

**1. Sentences.**

There was no error at all.  Apprendi's prohibition "applies only when the disputed 'fact' enlarges the applicable statutory maximum and the defendant's sentence exceeds the original maximum." United States v. Caba, 241 F.3d 98, 101 (1st Cir. 2001); see also Apprendi, 530 U.S. at 490.  Appellants recognize the often-stated view of this court, but invite us to overlook our own (and Supreme Court) precedent in favor of a much more sweeping view of Apprendi.  We decline the invitation.

Here the district judge sentenced each defendant to 235 months, which is less than the 240-month statutory maximum sentence for trafficking even the smallest quantity of cocaine.  See 21 U.S.C. § 841(b)(1)(C) ("catchall" provision providing a 240-month maximum).  "No Apprendi violation occurs when the district court sentences a defendant below the default statutory maximum, even though drug quantity,

-41-

determined by the court under a preponderance-of-the-evidence standard, influences the length of the sentence imposed." Robinson, 241 F.3d at 119 (collecting cases). "Apprendi simply does not apply to guideline findings (including . . . drug weight calculations) that increase the defendant's sentence, but do not elevate the sentence to a point beyond the lowest applicable statutory maximum."[15] Caba, 241 F.3d at 101; see also United States v. Houle, 237 F.3d 71, 80 (1st Cir. 2001).

## 2. Statutes.

Next, Lopez-Lopez, Luciano, and Santana argue that, under Apprendi, 21 U.S.C. §§ 841 and 952 are facially unconstitutional because they do not specifically assign the drug quantity determination to the jury and, in certain controlled substance cases, they expose defendants to sentences beyond the lowest maximum sentence based on judicially-determined factors. In United States v. Valdez-Santana, No. 00-2138, 2002 WL 193088 (1st Cir. Feb. 12, 2002), the court rejected this argument on plain error review. Id. at *3. Even bypassing the problem of forfeiture, we reject appellants' argument.

As we noted in Valdez-Santana, id., many courts of appeals have found § 841 constitutional although it is silent on who should determine drug quantities. E.g. United States v. Buckland, No. 99-30285, 2002 U.S. App. LEXIS 756, at *11 (9th Cir. Jan. 18, 2002) (en

---

[15] This same analysis applies to appellants' hint that the district court's determination of their respective roles in the offense violates Apprendi.

banc); <u>United States</u> v. <u>Cernobyl</u>, 255 F.3d 1215, 1219 (10th Cir. 2001); <u>United States</u> v. <u>Brough</u>, 243 F.3d 1078, 1079 (7th Cir. 2001). Section 952 is similarly silent. This does not render the statutes unconstitutional. The statutes' text does not conflict with <u>Apprendi</u>'s rule and a sentence remains valid so long as there is no <u>Apprendi</u> violation in the course of its implementation. <u>Valdez-Santana</u>, No. 00-2138, 2002 WL 193088, at *3 (upholding § 952); <u>Buckland</u>, No. 99-30285, 2002 U.S. App. LEXIS 756, at *3 & n.1 (collecting cases upholding § 841).

## K. Appointment of United States Attorney Guillermo Gil (Lopez-Lopez, Santana)

Lopez-Lopez and Santana argue that the district court erred by refusing to allow them access to discovery concerning their constitutional challenge to the appointment of United States Attorney Guillermo Gil. Our decision in <u>United States</u> v. <u>Hilario</u>, 218 F.3d 19 (1st Cir. 2000), is controlling here and it defeats appellants' claim. <u>See</u> <u>Valdez-Santana</u>, No. 00-2138, 2002 WL 193088, at *4 (holding that <u>Hilario</u> rejects "as applied" challenges to Gil's appointment). Indeed, Santana concedes that his argument in the district court was identical to the argument rejected by <u>Hilario</u>. Appellants' attempt to distinguish their as applied challenge from the holding of <u>Hilario</u> is fruitless. We reject appellants' claim as utterly without merit. We discourage parties in the future from making arguments, such as this one, that this court has already rejected.

-43-

## III.

The convictions and sentences are <u>affirmed</u>.