# United States Court of Appeals

## For the First Circuit

No. 01-1460

UNITED STATES OF AMERICA,
Appellee,

v.

RAMÓN FIGUEROA-ENCARNACIÓN,
Defendant, Appellant.

_____

No. 01-1788

UNITED STATES OF AMERICA,
Appellee,

v.

ALBERTO MEDINA,
Defendant, Appellant.

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Daniel R. Domínguez, U.S. District Judge]

_____

Before
Boudin, Chief Judge,
Torruella and Lipez, Circuit Judges.

_____

Bruce J. McGiverin, with whom María H. Sandoval were on brief, for appellant Ramón Figueroa-Encarnación.
Rachel Brill, for appellant Alberto Medina.
Thomas F. Klumper, Assistant United States Attorney, with whom H.S. García, United States Attorney, and Sonia I. Torres, Assistant United States Attorney, Chief, Criminal Division, were on brief, for appellee.

_____

September 8, 2003

_____

**TORRUELLA, Circuit Judge**. Co-defendants and appellants Ramón Figueroa Encarnación ("Figueroa") and Alberto Medina ("Medina") were charged in a two count indictment with (1) aiding and abetting each other in the knowing, intentional and willful possession with intent to distribute of fifty grams of cocaine base (crack cocaine) in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2 ("drug count"); and (2) aiding and abetting each other in the knowing possession of a firearm during and in relation to a drug trafficking crime, in contravention of 18 U.S.C. § 921(a)(3) ("gun count"). Figueroa was convicted of the gun count and acquitted of the drug count; Medina was convicted of the drug count and acquitted of the gun count. Both now appeal, presenting various claims of error. After careful review, we affirm Figueroa-Encarnación's conviction in its entirety; we affirm Medina's conviction in part and reverse and remand it in part for proceedings consistent with this opinion.

## I. Background

On February 4, 1999, the Arrest and Search Warrant Division[1] ("the Division") of the Puerto Rico Police Department ("PRPD") began a new program to investigate drug trafficking in the

---

[1] The purpose of the Division was to 1) investigate various drug trafficking locations, also known as "drug points"; 2) determine the location of the drugs and weapons at these drug points; and 3) obtain search warrants from local judges in order to seize the drugs and weapons and to arrest the individuals involved in drug trafficking.

Jardines de Campo Rico Housing Project in Rio Piedras, Puerto Rico ("Campo Rico Project"). At the time, the Campo Rico Project contained various known or suspected drug dealing points, including one at the boundary with a privately owned complex, the Jardines de Berwind Condominium ("Berwind Condominium").

On February 4, 1999, three plain-clothed agents, Hiram Cruz Alvarez ("Agent Cruz"), Angel Vargas Cruz ("Agent Vargas") and Jose Umpierre ("Agent Umpierre"), were assigned to conduct the surveillance of the drug dealing points at the Campo Rico Project. Part of the plan for surveillance involved securing an upper-floor apartment in Berwind Condominiums as a vantage point.

According to the government's evidence, Agent Cruz observed Figueroa and Medina standing together at a known drug dealing point, the fence next to the Campo Rico Project. When someone in the project yelled "agua" -- a code word for police presence in the area -- Medina and Figueroa turned simultaneously and headed towards the stairs of the Berwind Condominium. Agent Cruz identified himself as a police officer, and then Medina and Figueroa split up and ran in different directions. Agent Cruz arrested Medina, who had in his possession a number of vials of crack cocaine. In addition, Medina possessed $108 in bills of small denominations. Agent Vargas arrested Figueroa, who was carrying a loaded .38 caliber revolver. A third person was arrested by agent Umpierre but was later released.

The defense argued, unsuccessfully, that Medina and Figueroa were attacked by several plain-clothed officers. Further, the defense claimed that the officers planted both the drug vials and the gun.

After a twelve day trial, Figueroa was found guilty of the gun count and acquitted of the drug count; Medina was found guilty of the drug count and acquitted of the gun count. As a result, Figueroa was sentenced to 60 months imprisonment and a supervised release term of 3 years. For his part, Medina was sentenced to 151 months and a supervised release term of 5 years. In addition, the district court imposed a $100 special monetary assessment on each of the men. This consolidated appeal followed.

## II. Figueroa's Claims

### A. Vouching

Appellant Figueroa argues that, during his closing argument, the prosecutor improperly vouched for the credibility of Agents Cruz and Umpierre.[2] Because there was no contemporaneous objection to the statements, we apply the plain error standard of review "which includes a stiff requirement for showing prejudice." United States v. Adams, 305 F.3d 30, 37 (1st Cir. 2002). This Court evaluates the prosecutor's comments in the context of the

---

[2] At oral argument, Medina joined Figueroa's vouching claim. We need not decide whether Medina in fact waived the argument by failing to raise it in his brief because the same facts are involved. The outcome and analysis of either defendant's vouching claim would be the same.

trial as a whole.  United States v. Rosales, 19 F.3d 763, 767 (1st Cir. 1994).

The alleged vouching involved the agents' testimony about a third person who was arrested but not prosecuted.  The trial testimony of the two agents established that, while in the process of arresting Medina, Agent Cruz observed a third person throw something to the ground and asked Agent Umpierre to investigate. Agent Umpierre discovered a fast food cup that contained 17 bags of cocaine.  As a result, a third person was arrested, but he was later released when the district attorney concluded there was insufficient evidence against him.

During closing arguments, the prosecutor referenced the testimony regarding the released third person, stating:

> And what is important about this third person? What is it that they told the district attorney about this third person?  Jose Umpierre told you that they indicated to him exactly what it is that they saw.  That Hiram Cruz's testimony was the only thing that linked this person to what was found.
>
> And Hiram Cruz said I saw him throw something to the ground.  I don't know what it is.  I cannot say that it's the cup and I will not say that it's that cup.  Based on that the district attorney decided that there wasn't enough to hold this third person and orders to Jose Umpierre to release him.  He's not here today.  He was not charged.
>
> Hiram Cruz could have said I saw him throw that cup to the ground.  Even better Hiram Cruz could have said we recovered it from his pocket.  Jose Umpierre could have said we

-5-

recovered this from his pocket. That never happened.

Figueroa argues that the above statements constituted improper vouching or bolstering of the agents' credibility that unfairly prejudiced him. In particular, he claims that "the clear purpose of the government's argument regarding the release of the third person was to persuade the jury that prior to trial the government engaged in a process to release the arguably innocent and charge only the unquestionably guilty." He asserts that by stating that the third person was not prosecuted because the district attorney thought there was insufficient evidence against him, the closing argument implied that the district attorney had determined the evidence against Figueroa and Medina was solid.

It is well established that federal prosecutors may not resort to improper means or argument in order to obtain a conviction. See, e.g., United States v. Capone, 683 F.2d 582, 585 (1st Cir. 1982) ("It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a conviction as it is to use every legitimate means to bring about a just one."). Further, the government cannot use the "prestige of the United States" to bolster the credibility of its witnesses. United States v. Rosario-Diaz, 202 F.3d 54, 65 (1st Cir. 2000).

The statements complained of, which are quoted above, are not even arguably vouching in its classic form. The archetypal example of vouching is a prosecutor's claim that the witness should

-6-

be believed because the prosecutor -- a representative of the government -- believes the witness (hence, the term "vouching" as in "vouching for"), and it has been extended to embrace other instances in which the prosecutor improperly asks the jury to accept the government's position on the ground that the government in general should be believed or should be assumed always to do the right thing. See, e.g., United States v. Garza, 608 F.2d 659, 664-65 (5th Cir. 1979) (finding prosecutor's closing argument improper where he vouched for the integrity of key government witnesses and "argued that the prosecution would not have been commenced, and that he personally would not have participated unless it had already been determined that defendant was guilty").

By contrast, the prosecutor's statement in the present case followed a different logic. In substance, the prosecutor argued, to rebut direct attacks that the police officers had fabricated their testimony, that the evidence already admitted showed that the police had ample opportunity to lie about a third person and did not lie, and, therefore, that the police were honest folk who should be believed. The reference to what the prosecutor did might conceivably have been taken in the way suggested by defense counsel's argument on appeal -- that the prosecutor releases the arguably innocent and charges only the guilty -- but the statement that might conceivably lend itself to such a reading was overtly offered only to show that the honesty of the policeman

-7-

(refusing to say that he saw the third person throw down the cup) led to the inevitable result that there was no evidence against the third person and so he was released.

Perhaps if an objection had been made at the time of trial to this limited portion of the three paragraphs quoted above, the judge might have instructed the jury to disregard any such reference as to the district attorney's motives and attitude, although we might regard either the giving or the refusing to give such a caution as a discretionary judgment call. Alternatively, possibly trial counsel could have articulated some different objection to the three paragraphs as a whole -- for example, that they involved an impermissible attempt to accredit the character of a witness by instances of honesty, cf. Fed. R. Evid. 608 -- but trial counsel did not express an objection in these terms. In sum, the objection to the closing, whether characterized as vouching or some other terms, is not remotely plain error and that is the end of the matter.

B. Failure to Acquit

Figueroa also argues that he was improperly denied a judgment of acquittal because the case falls into an exception to the Powell-Dunn rule.[3] His main contention is that a verdict

_____

[3] Under United States v. Powell, 469 U.S. 57 (1984) and Dunn v. United States, 284 U.S. 390 (1932), a "claim that the jury verdict is internally inconsistent" is "essentially unreviewable." United States v. Alicea, 205 F.3d 480, 484 (1st Cir. 2000)

-8-

acquitting him of the drug count and finding him guilty of the gun count is inconsistent because drug possession is an essential element of the gun count. Further, Figueroa argues that the jury verdict stemmed from the court's refusal to submit the defendant's special verdict form to the jury and from an erroneous jury instruction, which mentioned "sole" possession.

Determinations of law are reviewed de novo. United States v. Palmer, 203 F.3d 55, 60 (1st Cir. 2000). Challenges to jury instructions are reviewed for an abuse of discretion, United States v. Ranney, 298 F.3d 74, 79 (1st Cir. 2002), although alleged "error[s] 'involving the interpretation of the elements of a statutory offense'" are reviewed de novo. United States v. Shea, 150 F.3d 44, 49-50 (1st Cir. 1998) (quoting United States v. Pitrone, 115 F.3d 1, 4 (1st Cir. 1997)).

Figueroa argues here that his gun conviction required proof of all the elements of a drug trafficking crime. Figueroa was convicted under § 924(c)(1), which imposes a five-year prison term on any person who "uses or carries a firearm" "during and in relation to any . . . drug trafficking crime." 18 U.S.C. § 924(c)(1). The elements of a § 924(c)(1) offense are: "(1) that the defendant committed the predicate drug trafficking crime. . .; (2) that the defendant knowingly carried or used a firearm; and (3) that the defendant did so during and in relation to the specified

-9-

predicate offense." <u>United States</u> v. <u>Currier</u>, 151 F.3d 39, 41 (1st Cir. 1998).

We join several of our sister circuits in holding that a defendant may be convicted for possession of a weapon in furtherance of a drug trafficking crime under § 924(c) even if he is acquitted of the underlying drug possession crime.[4] <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Frayer</u>, 9 F.3d 1367, 1372 (8th Cir. 1993) (requiring "only that a defendant carry a firearm in connection with a drug crime; it is not necessary that he be convicted of the underlying drug offense" in order to be convicted under 18 U.S.C. § 924(c)); <u>see also</u> <u>United States</u> v. <u>Laing</u>, 889 F.2d 281, 288-89 (D.C. Cir. 1989) (upholding a verdict where defendant was found guilty of gun charge and acquitted on drug possession count). Thus, we uphold the jury verdict despite the alleged inconsistency.[5]

---

[4]  This holding is in keeping with our general view that an inconsistent verdict should stand where there is sufficient evidence to "sustain a rational verdict of guilt beyond a reasonable doubt." <u>United States</u> v. <u>Lopez</u>, 944 F.2d 33, 41 (1st Cir. 1991). Here, there was sufficient evidence to sustain a rational verdict of guilt on both counts. Inter alia, the two defendants were observed to flee together upon hearing the warning call. Drug quantities consistent with distribution purposes were found on co-defendant Medina, and Figueroa had a gun. The government presented expert testimony that drug traffickers typically split up the drugs, money and weapons amongst several dealers. Taken as a whole, the evidence could have rationally sustained a verdict on both the gun and drug counts for both defendants.

[5]  Because we find that a conviction of the predicate drug possession offense was unnecessary to the conviction on the gun

-10-

Figueroa also contends that the verdict resulted from the use of the word "sole" in the jury instructions over Figueroa's objection.[6] Figueroa "contends that the erroneous instruction led the jury into error and further warrants a judgment of acquittal." In this Circuit:

> [i]t is an established appellate rule that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived . . . . It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . . . Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.'

King v. Town of Hanover, 116 F.3d 965, 970 (1st Cir. 1997) (quoting Willhauck v. Halpin, 953 F.2d 689, 700 (1st Cir. 1991)).

Here, Figueroa argues that the use of the word "sole" was confusing to the jury and was inconsistent "with the facts and the

---

count, we need not address Figueroa's unclear special verdict form argument.

[6] When the district court instructed the jury as to the gun count under § 924(c)(1), it included the following description as the first element: "the defendant committed the crime of possession with intent to distribute cocaine base." According to the instructions, "'[p]ossession' includes both sole possession and joint possession. If one person alone has actual or constructive possession, it is sole possession. If two or more persons share actual or constructive possession, possession is joint. Whenever I have used the word 'possession' in these instructions, I mean joint as well as sole possession." The instructions also stated that "[t]he firearm must have played a role in the crime or must have been intended by the defendants to play a role in the crime. That need not have been its sole purpose, however."

-11-

indictment," but he does not reference which instance of the word "sole" he finds objectionable or provide any explanation as to how or why the word might have caused confusion. He cites no case law or support for his argument. As a result, we find Figueroa has waived any viable argument he may have had regarding the jury instructions.

### C. Response to the Deadlocked Jury's Note

Figueroa joins Medina in claiming that the district court erroneously instructed the deadlocked jury to continue deliberating. We address his claim along with Medina's in Part III(A) below.

### D. Discovery Regarding U.S. Attorney Gil

Figueroa's next argument is one we have heard before: that "the district court erred by refusing to allow [him] access to discovery concerning [his] constitutional challenge to the appointment of United States Attorney Guillermo Gil." United States v. Lopez-Lopez, 282 F.3d 1, 23 (1st Cir. 2002). Figueroa's claim is as meritless as it is familiar. There is no need to revisit the issue since Figueroa concedes that his facial challenge to the interim appointment mechanism is identical to the one we rejected in United States v. Hilario, 218 F.3d 19 (1st Cir. 2000), and his as-applied challenge mimics the one rejected in Lopez-Lopez, 282 F.3d at 23. We reiterate that "[w]e discourage

parties in the future from making arguments, such as this one, that this court has already rejected."  Lopez-Lopez, 282 F.3d at 23.

E. Impact of Apprendi

Finally, Figueroa argues for the first time on appeal that the district court should have dismissed the drug count because Apprendi v. New Jersey, 530 U.S. 466 (2000), rendered the relevant statute, 21 U.S.C. § 841, unconstitutional.  This argument is wholly meritless, however, and we need not belabor it because this Court has upheld the validity of § 841 post-Apprendi. Lopez-Lopez, 282 F.3d at 22-3.

**III. Medina's Claims**

A.  Response to the Deadlocked Jury's Note

Medina argues[7] that the district court committed reversible error in its instructions to a deadlocked jury.  The trial lasted twelve days, and after the jury had been deliberating for almost four hours, it sent a note to the judge at 8:05 p.m. on the night of Friday, September 26, 2000 stating: "We wish to advise you that up to this moment we have not been able to reach an agreement.  We understand that even if we stay deliberating for more time we will not be able to reach a verdict."  The judge, who

[7] Figueroa joins this argument in its entirety.  Our determination is the same as to both defendants.

-13-

felt it was "too early to give them an <u>Allen</u> charge,"[8] instructed

the jury as follows:

> The court received a note from you that basically says that you have not been able to reach an agreement. And you also state that even if you deliberate more time you're not going to reach an agreement.
>
> Well, after a 12 day trial some days we worked eight hours, some days we only worked four hours. But it's still 12 days of receiving evidence. I think it is too premature for the judge after 12 days of receiving evidence to accept that there is a deadlock. These matters do occur, and they occur sometimes more times than we would like, but they occur.
>
> So, what the Court is going to do is to send you home, relax, not think about the case and come back tomorrow at 9:30 AM and at which time I will provide you an instruction. Please do not begin any deliberation until you come back here tomorrow morning.

Medina did not object to the instructions at trial, thus,

we review for plain error. Fed. R. Crim. P. 52(b). Under plain

error review there must be a showing that there is an error, that

the error is "clear" or "obvious," and that it has affected

substantial rights by, for example, impacting the outcome of the

trial. <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 734-35 (1993)

(internal quotations omitted); <u>United States</u> v. <u>Hernandez-Albino</u>,

177 F.3d 33, 37 (1st Cir. 1999).

---

[8]  <u>See generally</u> <u>Allen</u> v. <u>United States</u>, 164 U.S. 492 (1896).

The court's comments indicate that the judge did not perceive the jury to be deadlocked. Moreover, his instruction to continue deliberating did not contain the coercive elements of a garden-variety Allen charge,[9] but was merely intended to prod the jury into continuing the effort to reach some unanimous resolution. In United States v. Prosperi, 201 F.3d 1555 (11th Cir. 2000), the court determined that a brief, neutral instruction issued under similar circumstances did not constitute an Allen charge:

> The instruction given here . . . cannot be properly considered an Allen charge. The judge's simple request that the jury continue deliberating, especially when unaware of the composition of the jury's nascent verdict, was routine and neutral. Nothing in the brief instruction suggested that a particular outcome was either desired or required and it was not "inherently coercive."

Id. at 1341. The Fifth Circuit has referred to instructions of this nature as "modified Allen charges," see United States v. Clayton, 172 F.3d 347, 352 (5th Cir. 1999), and similarly held that such charges do not result in plain error when unaccompanied by mitigating language emphasizing the jury's right to fail to reach consensus. The salient principle is that such "counteractive" language, see United States v. Manning, 79 F.3d 212, 222 (1st Cir.

---

[9] In a typical Allen charge, the jurors are told inter alia that absolute certainty cannot be expected in the vast majority of cases, that they have a duty to reach a unanimous verdict if they can conscientiously do so, and that dissenting jury members should accord some weight to the fact that a majority of jurors hold an opposing viewpoint. See Allen v. United States, 164 U.S. 494, 501 (1896).

-15-

1996), is only deemed necessary where a "dynamite charge" is delivered to a deadlocked jury. Under these circumstances, mitigating instructions alleviate the prejudice to the defendant arising from the court's insistence that a presumably hung jury endeavor to reach consensus on either acquittal or conviction. Where, as here, the judge reasonably concludes that the jury is not deadlocked in the first instance, the defendant is not prejudiced by a simple instruction to continue deliberating. The district court's instruction in this case did not imply a duty to achieve unanimity, nor was it addressed to jurors holding a minority viewpoint. See Allen, 164 U.S. at 501. It stands to reason that if a district court's instruction lacks the coercive elements of an Allen charge, it need not include the Allen cure. Here, the requisite coercion is simply absent and, thus, reversal on this ground is unwarranted.

### B. References to Medina's Silence

Appellant Medina raises for the first time on appeal the argument that Figueroa's counsel and the prosecutor impermissibly commented on Medina's decision not to testify on his own behalf at trial. Since no contemporaneous objection was made to the statements, we review for plain error. United States v. Hughes, 211 F.3d 676, 684 (1st Cir. 2000).

Defendants have the constitutional right to remain silent at trial; when they exercise the right and refuse to testify, it is

improper for comments to be made regarding the silence. See, e.g., Griffin v. California, 380 U.S. 609, 614-15 (1965) (holding prosecutor may not comment on defendant's silence); see also United States v. Bonfant, 851 F.2d 12, 14-15 (1st Cir. 1988) (indicating that one co-defendant's comments regarding another co-defendant's decision not to testify is also problematic). In evaluating whether a comment infringed on a defendant's Fifth Amendment rights, this Court considers "'(w)hether the language used was manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" Lussier v. Gunter, 552 F.2d 385, 389 (1st Cir. 1977) (quoting Knowles v. United States, 224 F.2d 168, 170 (10th Cir. 1955)).

First, Medina argues that Figueroa's counsel made several questionable comments regarding Medina's silence. Medina objects to the fact that Figueroa's counsel argued that Figueroa fully admitted his past crimes, pleading guilty or admitting under oath that he went for a joy ride in a rental car and that he arrived illegally in Puerto Rico by boat. Figueroa's attorney stated:

> Ramón Figueroa Encarnación had no obligation
> to take the stand and no obligation to bring
> in documents, had no obligation to bring in
> witnesses. . . . Why did he do it? Why did
> he ask me to do it? Because he knew you would
> never, if you sat here for three whole weeks,
> get the truth from the mouth of Hiram Cruz,
> Jose Umpierre and Angel Vargas

Medina contends that this impermissibly suggested to the jury that a defendant, such as Medina, that did not take the stand was more likely to be guilty.

The examples cited by appellant Medina simply did not trespass on his Fifth Amendment rights. Where one co-defendant opts to take the stand and testifies in a manner that benefits the non-testifying co-defendant, comment upon the former's decision to testify may be permissible. See, e.g., United States v. Bonfant, 851 F.2d 12, 14-15 (1st Cir. 1988) (allowing comment by co-defendant regarding his testimony because the testimony benefitted both defendants and because "[t]he privilege against self-incrimination of a co-defendant who does not choose to testify does not go so far as to deprive one who does so choose of effective argument in [her] behalf, so long as it is, as it was here, sensitive to the rights of others"). In the case at bar, Figueroa chose to testify at trial and his testimony favored both himself and Medina. Figueroa's testimony in no way incriminated Medina. When Figueroa's counsel referred to his testimony, he was attempting to bolster Figueroa's credibility by pointing out to the jury that Figueroa had admitted to his past wrongdoings. Figueroa's counsel was merely seeking to have the jury accept a version of events that would lead to an acquittal for both Medina and Figueroa. The statements regarding Figueroa's admissions on the stand were not of the type that a jury would "naturally and

-18-

necessarily" take as comments on Medina's own failure to take the stand.  See Lussier, 552 F.2d at 389.

Medina's second claim concerns statements made by the prosecutor.  Medina challenges the prosecutor's comment that "Counsel asked why didn't the United States call these other police officers.  Counsel has the same ability to call these police officers and she did not call these police officers.  You have to ask yourself why didn't she call these police officers."  Medina also objects to the prosecutor's discussion of whether "Figueroa really 'owns up' to things."  Finally, Medina takes issue with the prosecutor's remarks that a defense witness did not telephone the police.

We find none of the prosecutor's comments to be impermissible infringements on Medina's right to remain silent. The first statement merely refers to the failure to call police officers as witnesses to support the defense's theory of planted evidence.  This in no way comments upon Medina's own failure to testify.  The second challenged comment is permissible because it only rebutted Figueroa's claim that he accepts responsibility for his crimes and can in no way be construed as a comment on Medina's silence.  Finally, the third statement Medina objects to commented upon a particular defense witness's credibility.  Again, we think it is self-evident that the prosecutor's statement could in no way be perceived as commenting upon Medina's own silence.

We thus find that the challenged comments by the prosecutor, as well as those by the co-defendant, did not transgress Medina's Fifth Amendment rights.

### C. Availability of Safety Valve

Finally, Medina argues that the district court impermissibly foreclosed the application of a two level safety valve adjustment because of the firearm enhancement. Medina's guideline base offense level was increased by two levels, pursuant to U.S.S.G. § 2D1.1(b)(1), because "a dangerous weapon . . . was possessed" during the course of the offense. Medina does not contest on appeal the applicability of the § 2D1.1(b)(1) enhancement for possession of a firearm, but he contends that the firearm enhancement does not preclude the application of the U.S.S.G. § 5C1.2 safety valve.

Under § 5C1.2, a defendant is eligible for a two level guideline reduction if he meets the enumerated criteria. Here, we are only concerned whether the defendant could meet the requirement that he "did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense." U.S.S.G. § 5C1.2(a)(2). Application Note 4 to this guideline section indicates "the term 'defendant,' as used in subsection (a)(2), limits the accountability of the defendant to his own conduct and

conduct that he aided or abetted, counseled, commanded, induced, procured, or willfully caused."

Five of our sister circuits have found that application of § 5C1.2 is not precluded by a weapons possession sentence enhancement based on co-conspirator liability. See United States v. Pena-Sarabia, 297 F.3d 983, 989 (10th Cir. 2002) (holding "a joint criminal actor's firearm possession is not attributable to a defendant for purposes of applying the mandatory minimum safety valve provision"); United States v. Clavijo, 165 F.3d 1341, 1343-44 (11th Cir. 1999) (finding defendant was "entitled to safety-valve relief even though his co-defendant possessed a firearm"); United States v. Wilson, 114 F.3d 429, 432 (4th Cir. 1997) (refusing to attribute co-conspirators possession of a firearm to the defendant for the purpose of blocking the safety valve's application); United States v. Wilson, 105 F.3d 219, 222 (5th Cir. 1997) (agreeing that safety valve relief was not precluded unless defendant himself "actually possessed a firearm during the conspiracy"); In re Sealed Case, 105 F.3d 1460, 1462 (D.C. Cir. 1997) (holding that "co-conspirator liability cannot establish possession under the Guideline's safety valve"). We agree -- in order for the safety valve to be precluded because of a firearm enhancement, a defendant must possess or induce another to possess a firearm in accordance with § 5C1.2(2)(a)(2).

Although we find that any automatic equation of the possession of a firearm by another and unavailability of the safety valve is mistaken, the basis for the district court's action is unclear here. We thus find it necessary to remand to the district court for proper justification for the preclusion of safety valve relief or, absent such a justification, for resentencing consistent with this opinion.

## IV. Conclusion

For the above reasons, we **affirm** the district court's decision in part and **reverse and remand** in part.

**Affirmed in part, reversed and remanded in part.**